UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

FILED
U.S. DIST COURT
MIDDLE DIST. OF LA

2003 JUL 30 P 3:48

SIGN_____
BY DEPUTY CLERK

TEAMSTERS LOCAL NO. 5          CIVIL ACTION NO.: _____

VERSUS                        JUDGE: _____

FORMOSA PLASTICS              03-585-A-MZ
CORPORATION, LOUISIANA        MAGISTRATE JUDGE: _____

<u>COMPLAINT TO ENFORCE ARBITRATION AWARD</u>

<u>Jurisdiction</u>

1.

Jurisdiction of this Court is invoked pursuant to 29 U.S.C. § 185 (a) and (c), as this Court has "federal question" subject matter jurisdiction concerning the parties.

2.

Plaintiff Teamsters Local No. 5 ("Local 5") is a labor organization representing employees in an industry affecting commerce, as defined by 29 U.S.C. § 152 (5).

3.

Made defendant herein is Formosa Plastics Corporation, Louisiana ("Formosa"), an employer affecting commerce, as defined by 29 U.S.C. § 152 (2) (6) and/or (7).

<u>Venue</u>

4.

Venue is appropriate in the Middle District of Louisiana under 28 U.S.C. § 1391(b) and/or (c) and/or under 29 U.S.C. § 185 (a).

| INITIALS | DOCKET# |
|---|---|
| BS | 1 |

JVP
JP, Summons

Facts

5.

A collective bargaining agreement (hereinafter "CBA"), with a term from June 15, 2001 through June 14, 2004, is in existence between Local 5 and Formosa. A copy of said CBA is attached as Exhibit 1 hereto and made a part hereof as if reprinted *in extensio.*

6.

Formosa terminated employee Richard Todd Hanson ("Hanson") from his laboratory analyst's position on December 12, 2002. A copy of Hanson's termination letter is attached as Exhibit 2 hereto and made a part hereof as if reprinted *in extensio.*

7.

Local 5 grieved Hanson's termination. A copy of the grievance is attached as Exhibit 3 hereto and made a part hereof as if reprinted *in extensio* (hereafter "the Hanson grievance").

8.

When the parties could not settle the Hanson grievance short of arbitration, said grievance was submitted to arbitration, i.e. FMCS Number: 030113-04568-3.

9.

On April 11 and 28, 2003, the parties arbitrated the Hanson grievance before mutually selected impartial third party arbitrator, Michael S. Hill ("Arbitrator Hill"). The parties filed post hearing briefs with said arbitrator. The Hanson

grievance was accordingly submitted to Arbitrator Hill for his decision and award.

10.

In a July 5, 2003 written decision, Arbitrator Hill, *inter alia*: (a) reduced Hanson's termination to a suspension of one month, for the period of December 12, 2002 to January 11, 2003, (b) awarded Hanson reinstatement to his former position of employment, within 15 days of the receipt of the award, with back wages for the period from January 12, 2003 to the date of reinstatement, less any interim earnings from employment, and (c) directed that the payment of back wages should be effected within 15 days of receipt of documentation of any interim earnings. A copy of Arbitrator Hill's Decision and Award is attached as Exhibit 4 hereto and made a part hereof as if reprinted *in extensio* (hereafter "the Decision and Award").

11.

Local 5 avers that Formosa has failed to comply with the Decision and Award, namely that it has refused to reinstate Hanson and pay him the backpay owed to him, and accordingly is in breach of the CBA for failing to abide by the final and binding decision of the arbitrator.

12.

Local 5 shows that Arbitrator Hill was within his arbitral jurisdiction to make the Decision and Award that he made, and his Decision and Award is found within the essence of the extant

collective bargaining agreement.

13.

Accordingly, Arbitrator Hill's Decision and Award must be enforced against Formosa.

14.

Local 5 further alleges that Formosa is in legal bad faith for not obeying Arbitrator's Hill's Decision and Award, and thus Local 5 is entitled to an award of attorney's fees and costs for having to litigate in this Court concerning the enforcement of the Decision and Award herein.

<u>Prayer for Relief</u>

WHEREFORE, Teamsters Local No. 5 prays that after due proceedings are held that there be judgment in its favor and against Formosa Plastics Corporation, Louisiana, for the following though non-exclusive matters:

(1). That the July 5, 2003 Decision and Award from Arbitrator Michael S. Hill be enforced,

(2). That the Court order Formosa to reinstate Richard Todd Hanson to his laboratory analyst's position, as per Arbitrator's Hill's Decision and Award,

(3). That the Court order Formosa to pay Richard Todd Hanson the full amount of backpay owed, as per Arbitrator's Hill's Decision and Award,

(4). That the Court award Local 5 reasonable attorney's fees and costs for Formosa's bad faith refusal to comply

with a final and binding arbitration decision and award, and

(5). For all other relief, specific or general, legal or equitable, necessary in the premises.

BY ATTORNEY:

RANDALL G. WELLS
ATTORNEY AT LAW
717 S. Foster Drive, Suite 240
Baton Rouge, Louisiana  70806
(225) 927-3914
FAX:  (225) 927-3917

BY: _____
RANDALL G. WELLS
Trial Attorney
LA Bar Roll No.:  13360

Counsel to Plaintiff
Teamsters Local No. 5

## VERIFICATION

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

BEFORE ME, the undersigned Notary Public, personally came and appeared

KEITH PARTIN

who, after being first duly sworn, deposed and stated that he is the Business Manager for Teamsters Local No. 5, that he has read the allegations of the Complaint to Enforce Arbitration Award made by Teamsters Local No. 5 against Formosa Plastics Corporation, Louisiana, and that all allegations made therein are

true and correct to the best of his knowledge and information.

_____ *Keith Partin*
KEITH PARTIN

SWORN TO AND SUBSCRIBED before me this ___30th day of July, 2003.

_____
NOTARY PUBLIC

Case 3:03-cv-00585-JJB    Document 1    07/30/03    Page 8 of 64

Formosa Plastics Corporation, Louisiana

# AGREEMENT

# BETWEEN

## FORMOSA PLASTICS CORPORATION, LA
## BATON ROUGE PLANT

### AND

### TEAMSTERS LOCAL NO. 5

June 15, 2001 through June 14, 2004

EXHIBIT

Case 3:03-cv-00585-JJB     Document 1     07/30/03     Page 9 of 64

TABLE OF CONTENTS

ARTICLE 1 - Parties and Recognition ......................................................................... 1
      1.1  Parties ................................................................................................. 1
      1.2  Purpose ............................................................................................... 1
      1.3  Recognition and Unit

ARTICLE 2 - Conditions of Agreement ...................................................................... 1
      2.1  Complete Agreement ........................................................................... 1
      2.2  Collective Bargaining .......................................................................... 1
      2.3  Extra Contract Agreements .................................................................. 2
      2.4  Separability ......................................................................................... 2

ARTICLE 3 - Company, Union and Employee Relations .......................................... 2
      3.1  Union Membership Voluntary ............................................................. 2
      3.2  Union Stewards ................................................................................... 2
      3.3  Union Access ...................................................................................... 3
      3.4  Bulletin Boards .................................................................................. 3
      3.5  Dues Checkoff .................................................................................... 3
      3.6  No Strike/No Lockout ........................................................................ 4
      3.7  No Solicitation Policy ........................................................................ 4
      3.8  No Discrimination .............................................................................. 4

ARTICLE 4 - Management Rights .............................................................................. 5
      4.1  Management Rights ............................................................................. 5

ARTICLE 5 - Grievance and Arbitration Procedure .................................................. 6
      5.1  Grievance Procedure .......................................................................... 6
      5.2  Arbitration Procedure ......................................................................... 7

ARTICLE 6 - Hours of Work and Overtime .............................................................. 8
      6.1  Eight Hour Shifts ............................................................................... 8
      6.2  Twelve Hour Shifts ............................................................................ 8
      6.3  Overtime Pay ..................................................................................... 8
      6.4  Sixteen Hour Limit ............................................................................ 9
      6.5  Notice of Schedule Change ............................................................... 10
      6.6  Protection of Regular Hours .............................................................. 10

Case 3:03-cv-00585-JJB    Document 1    07/30/03    Page 10 of 64

6.7  Meal Allowances ........................................................ 10
6.8  Overtime Distribution ................................................ 10
6.9  Call In Pay and Reporting Pay ................................. 15
6.10  Shift Swaps for 12-Hour Shift Employees ............. 15

ARTICLE 7 - Discipline ..................................................... 16
7.1  Disciplinary Procedure ............................................. 16
7.2  Use of Prior Offenses .............................................. 17

ARTICLE 8 - Leaves of Absence ....................................... 17
8.1  Personal Leave .......................................................... 17
8.2  Bereavement Leave .................................................. 17
8.3  Jury/Witness Leave .................................................. 18
8.4  Other Employment During Leave ............................ 18
8.5  Posting of Leave ...................................................... 18

ARTICLE 9 - Seniority ...................................................... 18
9.1  Probationary Employees .......................................... 18
9.2  Factors to be Considered ......................................... 19
9.3  Plant Sections and Groups ....................................... 19
9.4  Plant Seniority ......................................................... 20
9.5  Section and Group Seniority .................................... 20
9.6  Effect of Move from Section to Section ................... 20
9.7  Limitations on Transfers .......................................... 21
9.8  Posting Entry Level Positions .................................. 22
9.9  Posting of Positions Above Entry Level ................... 22
9.10  Situations in Which Seniority is a Factor .............. 23
9.11  Reduction in Force ................................................ 23
9.12  Restoration of Force .............................................. 24
9.13  Loss or Retention of Seniority .............................. 25
9.14  Seniority List ........................................................ 26
9.15  Pay Upon Promotion ............................................ 26
9.16  Explanation of Disqualification ............................ 26

ARTICLE 10 - Holidays .................................................... 27
10.1  Holidays Observed ............................................... 27
10.2  Holiday Pay for Straight Day, 8-Hour Employees .. 27
10.3  Holiday Pay for 12 Hour Shifts ............................ 28
10.4  Eligibility ............................................................. 28

ARTICLE 11 - Vacations ................................................... 28
11.1  Eligibility and Length of Vacations ...................... 28
11.2  Delayed Vacation Eligibility ................................ 29
11.3  Vacation Week and Pay ........................................ 29
11.4  Vacation Pay Upon Retirement, Termination or Death ... 29
11.5  Vacation Scheduling ............................................. 29
11.6  Purchase of Vacation ............................................ 31

ARTICLE 12 - Insurance and 401(k) Plan .......................... 32
12.1  Life Insurance ...................................................... 32
12.2  Accidental Death & Dismemberment Insurance ..... 32
12.3  Medical and Dental Insurance .............................. 33
12.4  Sickness and Accident Disability Insurance .......... 33
12.5  Retiree Life Insurance .......................................... 34
12.6  Cash Benefit Pension Plan .................................... 34
12.7  Long Term Disability ............................................ 34
12.8  Section 401(k) Plan .............................................. 34

ARTICLE 13 - Miscellaneous Benefits ............................... 36
13.1  Clothing ............................................................... 36
13.2  Shoes ................................................................... 36

ARTICLE 14 - Classification and Pay ................................ 36
14.1  Change of Classification of Jobs and Rates of Pay . 36
14.2  Shift Differential .................................................. 36
14.3  New Equipment or Process ................................... 36
14.4  Effective Day of Pay Changes .............................. 37
14.5  Effect of Shutdown of Operations ........................ 37
14.6  Relief Pay ............................................................ 37

ARTICLE 15 - Subcontracting ........................................... 38
15.1  Subcontracting ..................................................... 38

ARTICLE 16 - Drug and Alcohol Policy ............................ 38
16.1  Drug and Alcohol Policy ...................................... 38

ARTICLE 17 - Retention of Qualifications ......................... 38
17.1  Retention of Qualifications ................................... 38

ARTICLE 18 - Maintenance Section ...... ....... ...... ... ...   .............. ............... 38

18 1  Classifications  ...... ..... ..  ... ... ... ... ... . ........... . ............... 38

18 2  Shift Openings in Classifications ...   ...................................  39

18 3  Work Assignments ................ ... ...  ... ... ... ... ... ... ....... ....... ... 39

18 4  Maintenance Staffing  ...  ....  .... .. ... ... ... ... ... ......... ... ...... . 39

18 5 Transfer between Classifications within Section  ... ... ...... ... ... ...... ...... . 40


ARTICLE 19 - Duration   ...   ....  ... ... ........ ...... ...  ... ... ........ ..... 41

19 1 Duration ... ..... ... ...  . ..... ...................... ... ... ............. ..... ..... ... ...... ..... .. ... 41


APPENDIX A  ... ....... ...... ..  ... ... ...    ............ ... ............... ........ ........ 43


APPENDIX B  ...  ...  ... ..   .. ... .... .. .. ... ...  ..... ........ ... ...... . ... ... 44


Concordance Table .      ... ... ... .. .. ... ...  ...  .....  .. ...  ........  ..... ......... 48

# ARTICLE 1
## Parties and Recognition

**1.1 Parties.** This Agreement is made and entered by and between the Baton Rouge Plant, Baton Rouge, Louisiana, of Formosa Plastics Corporation, LA, signatory hereto, hereinafter referred to as the "COMPANY", and TEAMSTERS, LOCAL NO. 5, hereinafter referred to as the "UNION".

**1.2 Purpose.** This Agreement is for the exclusive joint use and benefit of the contracting parties as defined and set forth herein. It is the intent and purpose of the parties hereto that this Agreement shall promote an improved industrial and economic relationship and to set forth herein the basic Agreement covering rates of pay, hours of work and conditions of employment to be observed between the parties and shall cover the employment of persons employed in the Company's Baton Rouge Plant, Baton Rouge, Louisiana, covered by this Agreement.

**1.3 Recognition and Unit.** The Company recognizes the Union as the sole and exclusive bargaining agent with respect to wages, hours and working conditions of the following classifications of employees employed by the Company for the purpose of collective bargaining as provided by the National Labor Relations Act, as amended

Included:   All maintenance, laboratory, and production employees and PVC and VCM loaders of the Baton Rouge Plant, Baton Rouge, Louisiana, Formosa Plastics Corporation, LA

Excluded:   All supervisory and management employees including guards, clerks, stores personnel, environmental, and technical employees, and all loaders except PVC and VCM.

# ARTICLE 2
## Conditions of Agreement

**2.1 Complete Agreement.** This agreement constitutes the full and complete contract between the parties hereto  It supersedes and replaces any and all obligations and/or agreements whether written or oral, between the Union and the Company

**2.2 Collective Bargaining.** It is mutually understood that the terms and conditions relating to the employment of workers covered by this Agreement have been decided upon by collective bargaining

Case 3:03-cv-00585-JJB   Document 1   07/30/03   Page 12 of 64

**2.3 Extra Contract Agreements.** The employer agrees not to enter into any agreement or contract with its employees individually or collectively which in any way conflicts with the terms of this Agreement. (Note: This clause does not preclude the Company and Union from entering into mutually agreed and signed Memoranda of Understanding in resolution of mutual problems that may arise during the term of this contract.)

**2.4 Separability.** In the event that any provision of this Agreement shall at any time be declared invalid by a Court of competent jurisdiction, the decision shall not invalidate the entire Agreement, it being the express intention of the parties that all other provisions shall remain in full force and effect.

In the event that any provision of this Agreement is held invalid, as set forth above, the parties shall enter into negotiations for the purpose of arriving at a mutually satisfactory replacement for the provision held invalid.

## ARTICLE 3
### Company, Union and Employee Relations

**3.1 Union Membership Voluntary.** An employee's choice to become a member of the Union is voluntary. Any employee who threatens or coerces or fails to perform their normal work assignments in a cooperative manner, as determined by management, to force another employee to join the Union will be subject to disciplinary action.

**3.2 Union Stewards.** The Union will furnish the Company the names of its stewards and the areas they will represent. The Company agrees to recognize the stewards chosen by the Union as representatives of the Union on the job. It shall be the duty of the stewards to represent the employees and handle all grievances with the proper employer representative.

The steward shall not by reason of his position as steward be exempt from performing his work, except that he shall be allowed sufficient time, not to exceed one hour in any workday, to handle any grievances or disputes concerning the work that may arise on the job. He shall not leave his assigned job to conduct Union business until he has given his supervisor at least one hour's notice and has been properly relieved. The supervisor shall make good faith efforts to relieve the steward within an hour.

The steward will handle such grievances or disputes and report back to his workstation when such grievances or disputes have been handled.

Failing to adjust any grievances, he shall submit same to his Business Representative of the Union for settlement, but he shall not have the authority to cause the stoppage of any work on the Plant site.

The steward shall not be discriminated against because of the faithful performance of his duties as steward.

The Company will pay each steward for a maximum of one hour per day spent during his regular working hours in handling grievances or meeting with management concerning the administration of this Agreement. No more than one steward will be paid for any particular grievance handling session or meeting. The Company shall not be required to pay stewards or other employees for work missed while attending arbitration hearings or contract negotiations.

**3.3 Union Access.** The Business Manager of Local #5 and/or his representative shall have access to the facility by approval only. Management will make available reasonable time for the conduct of appropriate union business based on the business conditions of the day. Union Business Representatives shall not conduct union business on Company paid time unless prior approval is received through the appropriate person in the Personnel Department.

**3.4 Bulletin Boards.** The Company will allocate the Union one suitable bulletin board in each of the locker rooms in addition to the main bulletin board for the purpose of posting notices of Union meetings, notices of elections of officers, and other noncontroversial information, for the benefit of its membership when signed by an authorized representative of the Union, and approved by the Plant Manager or his designee. Notices have to be authorized before being posted. Violation of this policy and procedure by any individual will result in disciplinary action up to and including discharge.

**3.5 Dues Checkoff.** The Company agrees to deduct from the wages of each employee covered by this Agreement when authorized by a signed voluntary authorization, initiation fees and membership dues. Said deductions shall be made out of the first complete payroll period of each month and transmitted to the Union before the end of the month in which such deductions are made.

2

3

Case 3:03-cv-00585-JJB     Document 1     07/30/03     Page 13 of 64

Signed voluntary authorizations shall be furnished by the Union on a form approved by the Company. a copy of which is attached.

The Union agrees to save the Company harmless for all deductions of initiation fees and membership dues made in accordance with this Agreement.

**3.6 No Strike/No Lockout.** The Union agrees that there will be no strike. picketing. work stoppage or slowdown by the Union or employees, and the Company agrees that there will be no lockout of employees, during the term of this Agreement

In further consideration of the mutual promises contained herein. the parties hereto expressly agree that neither party shall bring. or cause to be brought. any court or other legal or administrative action against the other until the dispute. claim. grievance or complaint shall have been brought to the attention of the party against whom it shall be made and the said party. after actual notice of same. shall. within a reasonable time, fail to take effective steps to correct the cause or circumstances giving rise to such dispute. claim, grievance, or complaint.

**3.7 No Solicitation Policy.** Employees will abide by the Company's no solicitation policy.

**3.8 No Discrimination.** The parties agree that they will continue their practice of not discriminating against any employee because of race, creed, color. national origin. age or sex. Any reference made within this Agreement which refers to the male gender shall also be construed to include the female gender. The Company will not discriminate against any employee covered by this Agreement because of membership in or activity on behalf of the Union. nor will it discourage membership in the Union

4

## ARTICLE 4
## Management Rights

**4.1 Management Rights.** Except as specifically limited by a provision of this Agreement, or restricted and/or prescribed by law. the Union recognizes the right of the employer to direct. operate. and manage the affairs of the Company.

The employer retains exclusively all of its normal and inherent rights. whether exercised or not. including. but not limited to. its right to determine. and from time to time redetermine: the number, location. and type of its various operations. functions and services and to continue or discontinue same in whole or in part; the methods. procedures. and policies to be employed in the operation of the Company; the selection and direction of the working forces in accordance with requirements determined by the employer; the acquisition of products that it sells from other manufacturers or producers; the creation, modification. or discontinuance of jobs; the creation of new job classifications; the establishment and change of work schedules and assignments; the decision to shift work schedules and hours to be worked; the decision to hire temporary and/or part-time employees; the decision to transfer or promote employees; the decision to cross-train employees; the decision to layoff. furlough, demote, or otherwise relieve employees from work for lack of work. lack of funds. or other legitimate reasons; the suspension, discharge, demotion, or other discipline of employees. subject to the grievance and arbitration procedure. the adjustment of wages for all employees; the decision to establish the number and locations of departments and plants, products to be manufactured. methods and schedules of productions, and means and processes of manufacturing; the decision to open new plants or departments; the decision to shift production from one plant or department to another plant or department regardless of whether a plant or department is covered by this Agreement; the decision to operate its business and assign its employees as it deems fit; the alteration or variance of past practices in such a manner as the employer may reasonably determine to be necessary for the orderly and efficient operation of its various functions and services, to establish incentive programs at any time; to sell the Company or dispose of its assets and dissolve the Company. or merge, consolidate or recognize the Company in accordance with its judgement

It is agreed that the enumeration of the above listed management rights shall not be deemed to exclude other inherent management rights not specifically enumerated.

5

Case 3:03-cv-00585-JJB    Document 1    07/30/03    Page 14 of 64

All of the rights, powers, functions and authority are retained by the Company, except as those rights, powers, functions and authority as specifically abridged, limited or modified by this agreement or law.

## ARTICLE 5
### Grievance and Arbitration Procedure

**5.1 Grievance Procedure.** A grievance is defined, for the purpose of this Agreement, as a claim by the Union or an employee that the Company has violated this Agreement. No management prerogative reserved solely to the discretion of the employer by the terms of this Agreement shall be made the subject of a grievance.

The procedures established by this Article shall be the exclusive remedy for any grievance. Any grievance not presented and processed within the time limits established herein shall be waived (unless such time limits are extended by mutual agreement of the Company and the Union in writing), and therefore such grievance may not be made the basis of any action, either under this Agreement or otherwise. The arbitrator shall have no authority to excuse the failure to comply with the time limits. Saturdays, Sundays, holidays, and excused paid absences shall be excluded in applying the time limits of this Article.

Grievances shall be presented and processed as follows:

**Step 1.** No later than eight (8) days from the date of the alleged violation, the employee shall discuss his grievance with his immediate supervisor in an effort to settle it. If the employee so desires, a Union steward may take part in such discussion.

**Step 2.** If the grievance is not settled or withdrawn, the Union may, within five days following the discussion at Step 1, present the grievance in writing, signed by the aggrieved employee or a Union steward, to the Section Manager and request a meeting for the purpose of attempting to settle it. Such meeting shall be held within ten days following presentation of the written grievance. If such meeting is not held within the ten-day period, the Union may proceed in accordance with Step 3.

**Step 3.** If the grievance is not settled or withdrawn, the Union may, within five days following the discussion at Step 2 or the expiration of the time limits therefor, present the grievance to the Human Resources Manager and request a meeting for the purpose of attempting to settle it. Such meeting shall be held within ten days following presentation of the grievance to the Human Resources Manager. The Human Resources Manager shall respond within five days of the meeting; if he fails to do so, this shall be considered a denial of the grievance. If such meeting is not held within the ten-day period, the Union may proceed in accordance with Step 4.

**Step 4.** If the grievance is not settled or withdrawn, the Union may, within ten days following the Step 3 meeting or the expiration of the time limits therefor, give written notice to the Human Resources Manager of its desire to submit such grievance to arbitration.

**5.2 Arbitration Procedure.** Within ten (10) days following the completion of Step 3 or the expiration of the time limits therefor, the Union may write for a panel of arbitrators from the Federal Mediation and Conciliation Service, from which the parties will choose an arbitrator. Each party will bear the expense of its own representative and any other expense of the arbitrator will be shared equally by the parties.

Failure to appeal a decision as specified above shall render the aggrieved matter settled.

The decision of the arbitrator will be final and binding on all parties. The arbitrator shall have the authority to interpret and apply the provisions of this Agreement; however, the arbitrator shall have no jurisdiction or authority to:

1   Add to, subtract from, modify or in any way change the provisions of this Agreement

6

7

Case 3:03-cv-00585-JJB    Document 1    07/30/03    Page 15 of 64

**6.5 Notice of Schedule Change.** In the event it becomes necessary to temporarily (temporarily is defined as the duration of the event) change schedules of work, the Company will give the employees affected notice 24 hours in advance of such change. No employee's schedule shall be changed except at the beginning of his workweek, unless business or operating conditions require such a change.

**6.6 Protection of Regular Hours.** Any employee who works in excess or outside of his regularly or temporarily scheduled days or hours during any day or week shall not be deprived of his rights to a full workweek, nor shall he be required to lose the excess time made (the word "temporary" as used in this section shall mean one (1) week).

**6.7 Meal Allowances.** Employees required to work scheduled or unscheduled overtime will be provided a meal allowance of $7.00 as follows:

A. First 1.5 hours, no allowance

B. 1 hour and 31 minutes - 6 hours, one allowance

C. 6 hours and one minute - 12 hours, one additional allowance

D. Over 12 hours, one additional allowance

**6.8 Overtime Distribution.** The purpose of this section is to provide for the distribution of overtime opportunities amongst employees and to provide overtime coverage. Overtime will be distributed amongst qualified employees and worked consistent with the following procedures.

A. The following rules shall govern the distribution of overtime to all hourly employees:

    1. Overtime may be scheduled or canceled as necessary

    2. Any employee requested to work holdover overtime who needs transportation home will be provided the transportation by the Company.

    3. If an employee is bypassed in the application of the overtime procedure, he/she will be given the next overtime opportunity. Failure of the bypassed employee to notify his supervisor within a week of occurrence will result in forfeiture of the next overtime.

B. The following rules shall govern the distribution of overtime in Operations, Laboratory, Cell Maintenance, and PVC Loading:

    1. An up to date daily record of overtime in hours will be kept by the supervisor in each overtime group and will be posted daily. For each employee, the supervisor will maintain a record of total overtime hours "offered" and total overtime hours "worked".

    2. All overtime except holdover overtime will be scheduled by offering voluntary overtime to the qualified employee with the lowest total overtime hours "offered." When an employee refuses voluntary overtime, he will be charged the amount of overtime offered

    3. If all qualified employees refuse voluntary overtime, the qualified employee contacted with the lowest total overtime hours "worked" will be forced to work the overtime. If two or more employees have the same number of overtime hours "worked," the employee with the least plant seniority will be forced. No employee will be required to work more than 12 consecutive hours as long as there are other employees available to work

    4. An employee forced to work overtime will have his total overtime hours "worked" charged double the amount of hours actually worked

    5. If an employee has missed work for more than fourteen (14) consecutive calendar days because of short term disability or has taken four (4) consecutive calendar weeks of vacation, that employee, upon return to work, may notify his supervisor of his desire to have his total overtime hours "offered" and total overtime hours "worked" charged with the average of the total overtime hours "offered" and "worked" by the other employees during that employee's absence.

10

11

Case 3:03-cv-00585-JJB    Document 1    07/30/03    Page 16 of 64

6. All overtime will be computed to the nearest hour. (Less than 30 minutes, no charge - 30 minutes and over, charge to the next hour.)

7. Holdover overtime up to and including one hour will not be charged.

8. Employees on call out will be charged for time "worked", not paid.

9. An employee on vacation will not be contacted for overtime until the start of the dog shift of the first day of the workweek following conclusion of vacation.

10. Overtime may be scheduled up to 120 hours in advance of the overtime requirement.

11. An employee transferred from one section or group to another, or hired into a section or group will, at the time the employee qualifies on the job, have his total overtime hours "offered" charged with the highest total overtime hours "offered" of the other employees in the same work area.

12. Total overtime hours "offered" and "worked" will be reduced to zero at the end of each contract year.

13. A twelve-hour shift employee will not be forced more than two (2) consecutive calendar days as long as relief is available.

C. The following procedure will apply to all classifications in the Maintenance Section:

1. Overtime work to be performed by Company employees shall be offered or assigned in the following order:

(a) Offer on voluntary basis to qualified employees

assigned to the station in which the work is to be performed, if applicable;

(b) Offer on voluntary basis to qualified employees in the group in which the work is to be performed;

(c) Offer on voluntary basis to qualified employees outside the group in which the work is to be performed;

(d) Force of qualified employees in the group in which the work is to be performed.

This does not restrict the right of the Company to assign overtime work to a contractor

2. Separate voluntary overtime lists and forced overtime lists will be maintained in each group. The voluntary overtime lists will be used for purposes of offering overtime on a voluntary basis, and the forced overtime lists will be used for purposes of requiring employees to work involuntary overtime. Up-to-date lists will be posted daily. At the beginning of each contract year, each list shall be renewed based on seniority as described below

3. Voluntary overtime shall be offered to the available qualified employees who the Company is able to contact in accordance with their standing on the appropriate voluntary overtime list At the beginning of each contract year, employees shall be listed on the voluntary overtime list in order of seniority, the senior employee being at the top Employees will be offered voluntary overtime in top-to-bottom order. The employee will immediately state whether or not he accepts the assignment and will rotate to the bottom of the voluntary overtime list regardless of whether he accepts or rejects the overtime opportunity In addition, an employee who accepts a voluntary overtime assignment and works (4) hours or more of overtime will rotate to the bottom of the forced overtime list.

12

13

Case 3:03-cv-00585-JJB   Document 1   07/30/03   Page 17 of 64

4. If employees are required to work involuntary overtime, qualified available employees who the Company is able to contact will be forced in accordance with their standing on the appropriate forced overtime list. At the beginning of each contract year, employees shall be listed on the force list in reverse seniority order, the junior employee being at the top. Employees shall be forced in top-to-bottom order. Once an employee has served a force, he will rotate to the bottom of the list.

5. Meal period work will not be subject to the overtime distribution rules.

6. An employee may be asked to work overtime on the job he is performing up to one-hour holdover maximum without affecting his position on the master overtime list.

7. All contacts on the master list will be recorded and subject to inspection by the Union

8. Employees shall not be charged for overtime for:

   (a) Proven illness (has worked less than four and one-half hours in the previous work-day)

   (b) Paid absences

9. When an employee has worked 16 consecutive hours, he will not be called out until he has been off-duty for a minimum of eight hours.

10. No employee will be required to work more than two (2) consecutive 16-hour shifts as long as relief from the voluntary list or other qualified employees are available.

11. In the event the Company experiences problems in covering overtime, it will so notify the Union and ask the Union to correct the problem. If the Company continues to experience such problems thereafter, it shall have the right to implement a pager system under which employees will be required to carry a pager and

report for work. Before doing so, the Company will give the Union notice of its intentions and will meet with Union in an effort to reach an agreement on the details of such a system.

12. In the Maintenance Section, the Company reserves the right to establish station assignments. If overtime work in a station is required, employees assigned to that station will have preference for voluntary overtime, and it shall be offered to them in accordance with their standing on the voluntary overtime list. If the Company's overtime requirements in a station cannot be met by volunteers assigned to that station, the procedures set forth in C above shall be followed.

13. Scheduled overtime will not be offered in excess of twelve (12) hours at a time

### 6.9 Call In Pay and Reporting Pay.

A. Call in Pay. Employees required to return to work outside their scheduled work hours or days with less than sixteen (16) hours notice shall receive two (2) hours "call-in" pay at their straight time rate in addition to pay for the hours worked. The employees involved shall receive total pay of not less than four (4) hours at their straight time rates. Employees who are properly relieved and are not notified until after clocking out time that they are required to work overtime shall be entitled to call-in pay.

B. Reporting Pay. Unless he is notified not to report, an employee who reports to work ready and able to work at his schedule starting time shall receive, at the Company's option, a minimum of four (4) hours work or four (4) hours pay at the employee's straight-time rate of pay

### 6.10 Shift Swaps for 12-Hour Shift Employees. Shift swaps for 12-hour shift employees will be allowed for partial shifts or full shifts and must be made within the same pay period.

14

15

Shift swaps to an open shift will not be made during a holiday week

Shift swaps will be defined as two (2) hours or more, pre-approved by the supervisor. The 'shift swap form must be completed and signed by the employee and the supervisor on the day of the swap.

The individual who initiates the shift swap will automatically be moved to the bottom of the overtime list. (See Personnel Policy 23)

Shift swaps during training will be allowed provided the employee maintains proper passing scores and meets the time frame to complete training. In addition, employees in positions who do not have a relief will be allowed to swap. Approval must be obtained from the Supervisor.

It is the employee's responsibility to ensure all payroll paperwork is properly completed and approved. Any payroll paperwork not properly completed and delivered to the Human Resource Department by Monday noon following the pay period end, will result in the employee not being paid properly for the current pay period. **The employee will be paid in the next payroll once proper paperwork is received.**

## ARTICLE 7
### Discipline

**7.1 Disciplinary Procedure.** Any disciplinary action taken, regardless of whether it is verbal, written, or time off, shall be done in the following manner:

A. The Union representative will be notified of the contemplated disciplinary action and what it concerns prior to the meeting described in (B), below.

B. The Union representative, the employee involved, and Company representative will then meet to let the employee and Union representative present any evidence it may have that could be of use in defending the employee against disciplinary action prior to any contemplated action being taken against the employee.

16

**7.2 Use of Prior Offenses.** No prior offense more than four (4) years old that did not involve disciplinary time off, shall be considered in respect to any contemplated disciplinary action against any employee.

Any disciplinary records not in the personnel file, except as stated above, will be destroyed or removed from the employee's record and never used in the future against the employee.

## ARTICLE 8
### Leaves of Absence

**8.1 Personal Leave.** When operating requirements will permit, an employee shall, on his request and for reasonable cause, which may include time to run for political office, be granted such leave of absence, without pay and without benefits, the Company may deem proper. Leaves of absence and benefits now granted employees entering the Armed Forces of the United States, including those now or hereafter required by law, shall continue to be granted during the term of this Agreement.

**8.2 Bereavement Leave.** When a member of the immediate family of an employee shall die, the Company will, upon such employee's request, grant a leave of absence from the hours the employee is scheduled for work during three (3) consecutive days, one of which must be the day of the funeral.

If the funeral takes place outside of a radius of 100 miles from Baton Rouge, said leave of absence will be increased to four consecutive days. The Company will pay the employee for the scheduled hours not worked up to three (3) days, or four (4) days, as the case may be, at the employee's straight-time hourly rate. The words "immediate family" shall include only wife or husband, children, step-children, parents, step-parents, brother, sister, grandchildren, grandparents, step-grandparents, father-in-law and mother-in-law. One day will be allowed for the spouse's grandparents, brothers and sisters.

Funeral leave will be allowed the day of, or the day before, or the day after the funeral where only one day funeral leave is allowed.

No pay allowance shall be granted in a case where the employee does not attend the funeral of the deceased relative. Proof of death and relationship may be required by the Company.

17

Case 3:03-cv-00585-JJB Document 1 07/30/03 Page 19 of 64

**8.3 Jury/Witness Leave.** Any employee summoned for jury service, or subpoenaed as a witness in a criminal or civil proceeding to which he is not a party, in a court of record shall be allowed the necessary time for such service when the employee is working in the day group or on the day shift or cannot reasonably be expected to work when working on another shift. The Company will pay the difference between the employee's regular straight time earnings and the compensation received for such service for each working day which the employee misses because of such service, provided that the employee has given the Company at least five days notice prior to beginning of his absence for such service.

An employee who has reported to the court for a given day, and is excused by the court from service before 12:00 noon, must report back on his job, if scheduled.

12-Hour shift employees who are required to report for jury duty will be excused from their night shift the previous night and made whole. These nights must be between Monday night and Thursday night. An employee scheduled to work Sunday night prior to jury duty will not be required to work past midnight.

The Company may request proof of hours spent on jury or witness duty and amount paid for such service.

**8.4 Other Employment During Leave.** An employee absent on leave who engages in employment without the consent of the Company, will be considered as having terminated completely his employment with the Company.

**8.5 Posting of Leave.** When an extended leave of absence is granted an employee, notice of the same will be posted on the Company's bulletin board.

### ARTICLE 9
### Seniority

**9.1 Probationary Employees.** Seniority rights of new employees shall begin as of the date of their respective continuous employment, but shall not be effective until after they have worked a probationary period of one hundred eighty (180) days, during which time they may be released at the Company's discretion without consideration being given to seniority.

**9.2 Factors in Determining Qualifications.** The following factors shall be considered in determining qualifications as used herein. Where factors numbers (2) and (3) are relatively equal, factor number (1) shall govern.

(1) Length of continuous service
(2) Qualifications, work history, skill and ability
(3) Physical fitness

**9.3 Plant Sections and Groups.** For the purpose of this Agreement, the plant will be divided into the following sections and groups:

1. Maintenance Section
   Field Mechanic Group
   Shop Group
   Electrical Group
   M&I Group
   Analyzer Group

2. PVC Section
   Operating Group

3. PVC Loading Section
   Loading Group

4. Utilities Section
   Operating Group

5. Chlorine Caustic Section
   Operating Group
   Cell Assembly Group

6. VCM Section #1
   Operating Group

7. VCM Section #2
   Operating Group

8. Laboratory Section
   Laboratory Group

Case 3:03-cv-00585-JJB    Document 1    07/30/03    Page 20 of 64

In the event a new section other than those listed herein is created by the Company, the Business Manager of Local No. 5 will be notified.

**9.4 Plant Seniority.** Plant seniority is that factor determined by an employee's last period of continuous service or employment with Formosa Plastics Corporation, LA, Baton Rouge Plant, and to include, if there was no break in continuous employment, the employee's last period of continuous service with Allied Chemical Corporation, Baton Rouge North Works and ICI Americas Inc., Baton Rouge Site. Except as otherwise provided herein, plant seniority shall be the applicable seniority in all situations in which seniority is a factor.

**9.5 Section and Group Seniority.** Section seniority is that portion of an employee's continuous service in a section. Where section seniority is equal, plant seniority shall prevail.

Group Seniority is that portion of an employee's continuous service in a group. Where group seniority is equal section seniority shall prevail.

Group seniority applies for promotion within a group and section seniority applies for promotion from one group to another within the same section, subject to the provision of Section 9.2.

**9.6 Effect of Move from Section to Section.** If an employee moves at his own request to another section, he shall lose his seniority in his former section as of the day he leaves that section and can return to his former section only in the event a vacancy exists. If such a vacancy exists, he will enter that vacancy at the 12-month progression rate. If an employee fails to qualify in his new section, he may return to his former section in the lowest classification and be placed at the 12-month progression rate.

If an employee who transfers is disqualified by the Company within 30 days in his new job for physical reasons, he shall return to his former job without loss of seniority and at his former rate of pay.

Employees temporarily moved to other jobs or sections at the Company's discretion shall not lose continuity of service, seniority or other rights enjoyed.

An employee who transfers from one section to another section, but fails to qualify, will bump back to the section he left, and will not be allowed to transfer to any section for a period of one (1) year.

20

**9.7 Limitations on Transfers.**

A.    Transfers from Section to Section in Operations and the PVC Loading and Laboratory Sections:

Employees who are hired into or transfer into a section must remain in that section for a period of 5 years before being allowed to transfer to another section.

*Note: All incumbent PVC Loaders in the newly formed PVC Loading Section will be allowed to transfer out after serving a three year lock-in counting from their FPC hire date subject to the provisions of Article 9.5.

Employees who meet the 5-year requirement and elect to transfer to another section will enter the new section at the 24-month progression pay rate and follow the 48-month progression system to the top rate.

Only one employee may transfer out of a section during any 12-month period unless the Company decides otherwise.

No employee in these sections will be allowed to transfer into the Maintenance Section unless he meets the qualifications specified in Sections 18.4 and 18.5.

B.    Transfers within Sections in Operations and the PVC Loading and Laboratory Sections:

An employee who successfully bids into the operator classifications of Utility, Board, and Relief must remain in that classification for a period of 5 years from the close of the bid.

Employees within a section will be allowed to bid on vacancies in higher classifications (job rates) in that section.

Employees shall not have seniority rights to change job assignments or shift assignments within the same classification (job rate) in the same section, nor to transfer downward (that is, to a

21

classification having a lower pay rate), and may do so only with the consent of the Company   In the event a vacancy occurs in a job assignment or shift assignment, an employee may submit a request to be moved which may be allowed at the discretion of the Section Manager.

C     Transfer within the Maintenance Section·

Employees who are hired into or transfer into a group or classification in the Maintenance Section must remain in that group or classification for a period of 5 years.

Employees who meet the 5-year requirement will be allowed to transfer to another classification subject to the provisions set forth in Section 18 4 and 18.5

Only one employee may transfer out of a group or classification within the Maintenance section during any 12-month period

**9.8  Posting Entry Level Positions.**  When a vacancy occurs in a starting job in a section, such vacancy will be posted for five (5) days in all sections

Employees who have requests for transfer on file at the close of the five (5) day posting period will be given the opportunity to fill the vacancy.

Employees desiring the opportunity to transfer into vacancies in other sections which may result from the initial vacancy must have their request on file for the desired positions at the close of the initial posting period.

Employees requesting transfers will be given a duplicate copy of such request

**9.9  Posting of Positions Above Entry Level.**  To fill permanent vacancies in a section  a notice of the job or jobs to be filled shall be posted five (5) days in advance on the bulletin board in the section

It is understood absentees shall have their right to bid the job upon their return to the section.

22

Bids must be returned within the five (5) days posting period

Bids may be rescinded only during the five (5) day posting period.

When the filling of a vacancy is likely to create other vacancies, the probable vacancies will be posted at the same time the original vacancy is posted.

**9.10 Situations in which Seniority is a Factor.**

Seniority shall be a factor, in accordance with the rules contained in this Agreement, in the following situations only:

(a)   promotion to a higher classification
(b)   layoff, demotion and restoration of force after layoff
(c)   overtime distribution
(d)   vacation scheduling
(e)   lateral transfer between sections
(f)   lateral transfer from one group to another in the same section
(g)   lateral transfer from one classification (job rate) to another in the same section

**9.11  Reduction in Force.**  Subject to the following provisions, the following rules will apply on reduction of forces:

A.     The Company will designate and post on the bulletin board, the jobs to be eliminated

B     1.     In operating groups, employees in jobs to be eliminated may bump employees in their sections holding jobs of equal or lower rank than the eliminated job on the basis of plant seniority, provided the employee holding the eliminated job can qualify to perform the job he seeks to bump   In operating groups, an employee may bump into a higher rated job on the basis of his plant seniority if he has previously performed the work in a satisfactory manner on a permanent or temporary basis, and left the job as a qualified employee

23

Case 3:03-cv-00585-JJB    Document 1    07/30/03    Page 22 of 64

2.    Additionally, an employee displaced from his section may exercise plant seniority to displace junior employees of equal, lower, or higher rank in other sections, provided he has previously performed the work and left the job as a qualified employee, or he may bump employees holding 2C or lower rated jobs provided he can qualify.

3.    In the Maintenance Section, employees in jobs to be eliminated may exercise plant seniority to bump employees in the Maintenance Section if qualified to perform the job to which they seek to bump, or they may bump employees in operating sections holding 2C or lower ranked jobs, provided they can qualify.

4.    While the current shift system is in effect, the operator bumping into an unchanged group will take days off established for the man he bumps. When two (2) operators or more bump into the same job, days off and shifts will be reestablished within the group according to plant seniority

C    In case of layoff, employees having the least plant seniority, the
f    other qualifications herein stated being relatively equal, shall be the first to be released   The Company agrees to give ten (10) days notice in advance to employees who are to be released on account of reduction in forces, or in the event notice is not given, ten (10) days pay.

**9.12  Restoration of Force.**  In the restoration of forces following release for lack of work, employees with two (2) or more years service who have been released for a period of not more than twenty-four (24) months shall, if qualified, be reinstated to the position to which their seniority entitles them before new employees are hired, provided they shall satisfactorily pass a physical examination by the Company physician before reinstatement. Employees with less than two (2) years service released for a period of not more than twelve (12) months shall also have preference for reinstatement before new employees are hired on the same basis.

It is not the intent of the physical examination to disqualify an employee who was partially disabled due to a job related injury and who was on the active payroll prior to layoff. The Company shall notify employees who are eligible to return to work by certified letter to the last address on file in the Company's employment office.

24

Employees so notified must advise the Company within five (5) days after receipt of certified letter if they intend to return to work and must return to work within twenty-one (21) days after notice is mailed to him that work is available. An employee who has been laid off due to lack of work may refuse temporary work without losing his seniority.

**9.13  Loss or Retention of Seniority.**

A.    An employee shall lose all seniority rights if he:

1.  is discharged for just cause;

2.  is laid off or released for a period whereby he loses all recall rights as provided in Section 9.12;

3.  fails to report within twenty-one (21) days after notice is mailed to him that work is available;

4.  voluntarily quits;

5   fails, without excuse deemed sufficient by the Company, to report on the first day following the expiration of a leave of absence;

6.  is transferred to a job outside the bargaining unit.

B.    When an employee is bumped from his group and/or section, he will retain his seniority until he has been given the opportunity to return to said group and/or section. Said employees may use seniority of section and/or group that he has been bumped into to bid jobs within the group and/or section without losing seniority of group and/or section that he was bumped out of.

1.  When employees are bumped from a group and/or section under conditions where they retain group and/or section seniority, they will be given the opportunity to return to said group and/or section in the inverse order of their seniority displacement from that section and/or group.

25

2. Upon return to the section and/or group in accordance with Paragraph (1) above, they may then exercise their section and/or group seniority for promotion as provided in Section 9.5 of the current Labor Agreement.

**9.14  Seniority List.**  An up-to-date seniority list based on Company records will be maintained in the Human Resource Department and will be available for inspection and check at reasonable times by duly authorized representatives of the Union (Union steward).

**9.15  Pay Upon Promotion.**  An employee promoted from a job of one classification to one of a higher classification will receive the higher rate either:

A.  Effective immediately when due to his past training as a relief man or otherwise, such employee has thoroughly learned the next job, or

B   Effective the first day of the pay period immediately following a satisfactory training period of ninety (90) days, or

C   When employee works the job alone, provided, however, that working the job alone with full rate shall not in and of itself be evidence that employee is qualified.

D.  When an employee is required to temporarily fill a job paying a higher rate of pay for less than one (1) hour, he shall receive his regular rate of pay. If an employee is required to temporarily fill a job paying a higher rate of pay for more than one (1) hour, he shall receive the higher rate for the entire shift. If an employee is required to temporarily fill the place of another employee receiving a lower rate of pay, his own rate shall be paid

E.  The reserve operator will be upgraded to the job he is filling, when the job is created due to an absence.  Reserve operators will not be upgraded for temporary assignments, such as refresher training

**9.16  Explanation of Disqualification.**  When an employee is disqualified from a job or for promotion, he will, on his Union steward's request, be given full explanation of the reasons for such disqualification, including examination of the tests and test results.

---

**ARTICLE 10**
**Holidays**

**10.1  Holidays Observed.**  There shall be ten holidays, namely:  New Year's Day, President's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving Day, Christmas Day and the day before or the day after Christmas

The holidays referred to above shall be the day designated by Federal law

**10.2  Holiday Pay for Straight-Day, 8-Hour Employees**  For each designated holiday, the Company will pay to each straight-day, 8-hour employee holiday pay of eight times his regular straight-time hourly rate, subject to these conditions:

A.  The employee shall have worked his scheduled hours on the day before the holiday, the day of the holiday, and the day after the holiday, unless he was excused from work due to a paid absence. An employee will not be disqualified if he reports to work late, but not in excess of two hours.

B   Employees who leave early on the day before the holiday on an unpaid absence will not be paid holiday pay.

C   A designated holiday falling on Sunday shall be observed on the following Monday and a holiday falling on Saturday shall be observed on the preceding Friday by straight-day 8-hour workers Designated holidays will be observed by other than straight-day, 8-hour workers on the actual calendar holiday

D   An employee working on a designated holiday will receive one and one-half times his regular rate of pay for all hours worked, in addition to holiday pay, if eligible

E.  Each designated holiday shall be counted as 8 hours worked for the purpose of computing 40 hours in a workweek, whether the holiday is worked or not, unless the employee fails to work his schedule on the holiday.

26

27

### 10.3 Holiday Pay for 12 Hour Shifts.

A.    Holidays worked in schedule: Employees will be paid straight time for all hours worked plus shift differential when applicable, and a holiday allowance of six (6) hours at the base rate.

B.    Holidays worked out of schedule: Employees will be paid time and one half for all hours worked, plus shift differential if applicable, and a holiday allowance of one (1) times his base rate for each hour worked.

C.    Holidays not worked --- pay 6 hours at the base rate.

D.    Holidays during vacation --- 6 hours at the base rate.

E.    Section 10.3 does not apply to 8-hour employees who temporarily fill a vacancy on a 12-hour schedule on a holiday.

**10.4 Eligibility.** Employees who are on disciplinary suspension shall not be eligible for holiday pay. Employees on short-term or long-term disability leave on a holiday who do not work some portion of the week in which the holiday falls shall not be eligible for holiday pay.

### ARTICLE 11
### Vacations

**11.1 Eligibility and Length of Vacations.** A new hire shall be eligible for a vacation of two weeks on the January 1 following his hire, provided he has worked for six months. If he has not worked for six months on that January 1, he shall be eligible for a vacation of two weeks upon completion of six months of employment. On each January 1 thereafter, and through his fourth anniversary, the employee shall be eligible for a vacation of two weeks. After completion of four years of service, on each January 1 the employee shall become eligible for a vacation of three weeks. After completion of nine years of service, on each January 1 the employee shall become eligible for a vacation of four weeks.

Except as provided in Section 11.4 with respect to retirees, and except for vacation eligibility as of the first January 1 following hire, vacation time is earned only by working a full year from the preceding January 1; no vacation is earned by working a partial year. Except for vacation earned during the first partial year of employment, as a condition for eligibility an employee must have worked no less than 1250 hours in the preceding calendar year. In addition, vacation eligibility in all cases is based on years of continuous employment.

**11.2 Delayed Vacation Eligibility.** When an employee fails to qualify for vacation because he was absent during the preceding year for thirteen (13) or more weeks due to a bona fide illness, accident or layoff, he may take a vacation during the calendar year as soon as he has worked eight hundred and thirty (830) hours.

**11.3 Vacation Week and Pay.** The vacation week shall conform to the employee's regular schedule of work. Vacation pay shall be computed on the basis of the employee's straight time hourly rate. Vacation pay for employees working 8-hour schedules shall consist of pay for forty (40) hours per week. Vacation pay for employees working 12-hour schedules shall consist of pay for the number of hours for the particular week of vacation as specified in Section 11.5-C.

**11.4 Vacation Pay Upon Retirement, Termination or Death.** Any employee who retires in a calendar year will have that years vacation earned prorated and will be paid for the earned vacation upon retirement.

In the case of employees who terminate voluntarily or otherwise, payment will be made for any vacation to which employee would have been entitled as of the date of termination and which had not theretofore been taken by same employee or paid for by the Company.

In case of death of an employee, payment will be made to the surviving spouse or other person in accordance with Louisiana R.S 9:1515 for any vacation to which the deceased employee would have been entitled as of the date of death and which had not theretofore been taken by the employee or paid for by the Company. In addition, payment will be made on a pro-rata basis for each full calendar month worked in the year of death.

In all other cases, employees must take all of the vacation for which they are entitled in each calendar year; vacation time may not be accumulated or carried over from year to year except by consent of the Company.

**11.5 Vacation Scheduling.** Conformably with operating requirements, vacations will be granted at times most desired by employees with preference to the employee having greatest plant seniority in case of conflict, providing the employee has given his preference to his foreman during the months of November

28

29

Case 3:03-cv-00585-JJB   Document 1   07/30/03   Page 25 of 64

and December of the year preceding the calendar year in which vacation is granted.

The following employees from Sections A and B listed below will be allowed to take one (1) week of their vacation one-half day at a time, minimum of four (4) hours, subject to the guidelines provided in each group. However, maintenance employees scheduled to work 12-hour shifts must take their vacation in blocks of no less than one week. Approval must be by the Department Head by the last workday of the week preceding the week of vacation. Employees who qualify for one-a-day or half-a-day vacation will be allowed to obtain approval for this leave within the same work week requested, but not in excess of 2 weeks in advance.

A       Maintenance Section - maximum number of people off on vacation on any one day:

| | |
|---|---|
| Field Mechanics | 3 |
| Machinist | 1 |
| Welder | 1 |
| Garage Mechanic | 1 |
| Transportation | 1 |
| Valve Technician | 1 |
| Seal Technician | 1 |
| Electrician | 2 |
| M & I Technician | 2 |
| Analyzer Technician | 1 |
| Refrigeration Technician | 1 |

B       Cell Assembly Group and 8-hour Laboratory Employee Vacation:

Allow one week (five 5 vacation days) per person to be scheduled one day or half-day at a time during open vacation weeks only.

Maximum number of persons off on vacation for one day - one

C.       12-Hour Shift

Twelve hour shift employees must schedule their vacation as follows:

| Weeks of Vacation | Vacation Weeks |
|---|---|
| 2 | One 36 & one 48 |
| 3 | Two 36 & one 48 |
| 4 | Two 36 & two 48 |

If for some reason, the employee is not able to schedule, as above, his vacation will be paid per the above schedule at straight time.

After the initial selection of vacation schedules, as provided above, changes to the schedule may be requested by employees. Such requests may be granted on the basis of plant seniority if the Company determines that any changes are in accordance with operating requirements.

**11.6 Purchase of Vacation.** The Company may buy up to two weeks of an employee's earned vacation per the following guidelines:

A.      Each October, the Company may offer to buy vacation based on projected production and work schedules in each section, for the following year.

B.      Employees must declare, at the time requested to schedule vacation in November and December for the following year, if he/she wants to sell vacation. Employees do not have to sell vacation.

C.      Employees who qualify for two weeks of vacation may sell one week.

D       Employees who qualify for three or more weeks of vacation may sell two weeks.

E.      Vacation will be paid per the schedule outlined in Section 11.5 C of this Agreement for 12 hour shift employees.

30

31

Case 3:03-cv-00585-JJB Document 1 07/30/03 Page 26 of 64

Example: An employee with two weeks of earned vacation who sells a 48 hour week and schedules a 48 hour week will be paid only 36 hours during the scheduled week.

## ARTICLE 12
### Insurance and 401(k) Plan

**12.1 Life Insurance.** The Company agrees that life insurance benefits under the Company's group insurance plan in the amount of one times annual straight time salary rounded down to the nearest thousand, subject to the provisions of such plan, be available to employees covered by this Agreement, without cost to the employees.

Further, such employees may, subject to the provisions of the plan, purchase supplemental life insurance in the amounts of one times or two times their annual straight time salary at the following monthly premium rates per $1,000 of coverage:

| Age | Rate |
|---|---|
| Under Age 30 | .07 |
| 30-34 | .11 |
| 35-39 | .15 |
| 40-44 | .25 |
| 45-49 | .43 |
| 50-54 | .71 |
| 55-59 | 1.11 |
| 60-64 | 1.61 |
| 65-69 | 2.52 |
| 70-74 | 4.27 |

The above rates are subject to change based on the yearly claim usage.

**12.2 Accidental Death & Dismemberment Insurance.** The Company agrees to make available to employees covered by this Agreement Accidental Death & Dismemberment insurance and Dependent insurance in the following amounts and rates, subject to the provisions of the policy.

An employee may subscribe to Accidental Death & Dismemberment up to the amount of life insurance in force, not to exceed one times annual straight time

salary at a cost of $.07 per month per $1,000. An employee may elect Dependent Life insurance in the following amounts:

> Spouse - $5,000
> Children - $5,000
> at a cost of $2.60 per month.

**12.3 Medical and Dental Insurance.** The Company agrees to make available to employees covered by this Agreement an 80-20 co-insurance comprehensive medical plan and a dental plan. The medical and dental plan will not be amended nor terminated for the duration of this contract without mutual agreement between the Company and the Union. The above plan will be available at the following cost:

1. Lifetime Cap Coverage of $500,000
   Single - $10.00/month
   Family - $25.00/month

2. Dental Plan
   Single - $4.00/month
   Husband/wife - $8.00/month;
   Employee (parent)/child - $10.00/month;
   Family Coverage - $13.00/month
   Maximum Benefit: $1,000 per person per calendar year,
   Class I, II and III.

**12.4 Sickness and Accident Disability Insurance.** The Company agrees to make available to employees covered by this Agreement, without cost to the employee, Sickness & Accident Disability Insurance, subject to the provisions of the policy. This insurance will be paid as follows:

A. No pay for the first two days unless hospitalized, or in receipt of approved outpatient surgery.

B. Fifty percent of regular scheduled straight time pay thereafter, up to 26 weeks.

C. Fifty percent of regular scheduled pay will be the maximum payment in combination with Workmen's Compensation, when applicable

32

33

Case 3:03-cv-00585-JJB    Document 1    07/30/03    Page 27 of 64

D.    Doctor certification required on all absences to collect payment.

Employees not scheduled for work may receive A&H benefits only if both the Company and the Union agree.

With respect to absences of less than a week, for 8-hour shift employees such payment will be made on a daily basis of one-fifth the weekly amount payable for days of absence occurring on workdays within the employee's regular schedule.

Partial payments for sickness of less than a whole day for 12-hour shift employees will be handled as follows (if hospitalized):

A.    Worked less than 4.5 hours - full day A&H benefit

B.    Worked 4.5 hours up to and including 9 hours _ day A&H benefit

C.    Worked more than 9 hours - no A&H benefit.

**12.5   Retiree Life Insurance.**   The Company will pay the entire cost of continuing $1,000 of group life insurance protection for pensioners who previously participated in the Company's Group Life Insurance Plan for as long as the pensioner lives and receives a pension from the Company.  Supplementary insurance in an amount which, together with the $1,000 free insurance, is equal to twenty percent of the amount of insurance carried under the Group Life Insurance Plan at time of retirement, will also be made available to such pensioners on a contributory basis at cost to the pensioner of 65 cents per thousand dollars of coverage.

**12.6   Cash Benefit Pension Plan.**   The Company will continue the Cash Benefit Pension Plan subject to the provisions of the plan.

**12.7   Long Term Disability.**   The Company agrees to provide to employees covered by this Agreement Long Term Disability.

**12.8   Section 401(k) Plan.**   The Company agrees to continue a 401(k) Savings Plan subject to government regulations.  This Plan will include a guaranteed match and a profit sharing match up to the first 4.5% by the Company based on the pretax basic contribution of the employee and subject to qualification by the employee and provisions of the Plan.

34

Matching by the Company will be 10% guaranteed and 80% based on profit of the Company on the employee's pre-tax basic contribution up to a total contribution of 5.0% of regular earnings by the employee.  The profit match will be subject to the Company (which is defined as "Formosa Plastics Corp., U.S.A.") making a profit.  "Regular earnings" is defined as basic hourly or salary earnings plus overtime and shift differential pay, exclusive of any and all other forms of remuneration.  This plan will be effective January 1, 2002.  In years where there is no match, FPC will provide the audited P & L Statement.

Example of matching:

| Employee Basic Contribution | Profit Matching | Company Guaranteed |
|---|---|---|
| 1.0% | 0.8% | 0.1% |
| 2.0% | 1.6% | 0.2% |
| 3.0% | 2.4% | 0.3% |
| 4.0% | 3.2% | 0.4% |
| 5.0% | 4.0% | 0.5% |

For old pension plan employees, the maximum Company match is 1.0% based on the Company making a profit.

For example:

| Employee Contribution | Company Profit Matching |
|---|---|
| 1.0% | 0.5% |
| 2.0% | 1.0% |
| 3.0% | 1.0% |

The Company agrees to continue the 401(k) Savings Plan per the plan guidelines and subject to government regulations

The Company will provide loan provisions from the 401(k)plan subject to the provisions of the plan.

35

ARTICLE 13
Miscellaneous Benefits

13.1 Clothing. The Company will pay one hundred percent (100%), to a maximum of $35.00 for trousers and $20.00 for shirts, of the replacement cost of damaged work clothes, provided that the employee's request for reimbursement is supported by an incident report indicating the cause of the damage to the clothes. This does not include normal wear and tear associated with the employee's job.

13.2 Shoes. The Company will pay up to $100.00 per year for safety shoes meeting ANSI standard Z41-1991 upon presentation of a receipt for purchase.

ARTICLE 14
Classification and Pay

14.1 Change of Classification of Jobs and Rates of Pay. The classification of individual jobs and rates of pay may be changed by mutual consent in writing of the parties hereto.

14.2 Shift Differential. A shift differential of $.50 per hour shall be paid all employees who are required to work the second shift and $1.00 per hour differential shall be paid all employees who are required to work the third shift. This includes all shift workers on overtime during applicable hours, but expressly excludes any regularly scheduled day worker working overtime who does not replace a shift job which would ordinarily receive the differential.

The 12-hour shift employees will be paid $1.00 shift differential per hour when working the night shift and no shift differential when working the day shift.

14.3 New Equipment or Process. When the installation of a new type of equipment or the development of a new manufacturing process necessitates the creation of a new job, the following procedure will apply:

A. The Company and the Union will discuss prior to the Company establishing the rate of pay for such job and the method of posting such job, before any employee is placed on the job.

B. The rate of pay for the new job shall at the Union's request, be subject to review by the Company and the Union forty-five (45) days after the start-up period to determine whether or not the rate of pay for the new job bears a

comparable relationship to the rates of pay for similar jobs in the plant.

C. Within five (5) days after the review is completed, or if no review is held, then within five (5) days after the above trial period has ended, any employee working on the new job may file a grievance claiming that the rate does not bear a comparable relationship to rates of similar jobs in the plant.

Should it be determined by such review that the job should be paid at a higher rate, such higher rates will be paid retroactive to the date the employee started on the job.

D. If a grievance is filed under this section and is taken to arbitration, the authority of the arbitrator shall be limited to a determination of whether the rate of pay bears a comparable relationship to the rates of pay of similar jobs in the plant.

E. The above provisions apply to existing facilities but will not apply when the manufacture of a new product(s) necessitates the creation of a new job. In such event, the rate of pay for the new job will be based on the duties of the new job. However, such rate will fall within the labor rates schedule provided in this Agreement. The Company and the Union will discuss such new jobs and the method of posting such jobs prior to the Company establishing the rate of pay for such jobs. This provision is subject to the regular grievance and arbitration procedure.

14.4 Effective Day of Pay Changes. All increases will be effective on the first day of the pay period following a qualifying event, including contractual rate adjustments.

14.5 Effect of Shutdown of Operations. If a section of any operation is shut down for an extended period of time (to be determined by management), employees in that section will be frozen at their existing rate of pay in the progression system until such time as the section is operating again and they are once again training in the appropriate classification. The resumption of progression pay will not be retroactive.

14.6 Relief Operator. The rate of pay for a relief position will be $.45 above the top rate for that section or at the time of qualifying if in the progression system

36

37

Case 3:03-cv-00585-JJB    Document 1    07/30/03    Page 29 of 64

## ARTICLE 15
### Subcontracting

**15.1 Subcontracting.** The Company reserves the right to sub-contract any or all of its Maintenance and Construction and its caustic loading activities at Management's discretion.

## ARTICLE 16
### Drug and Alcohol Policy

**16.1 Drug and Alcohol Policy.** Employees will abide by the Corporate Drug and Alcohol policy and program, as it may be amended from time to time on a Company-wide basis by the Company. Before any changes are implemented at the Baton Rouge plant, the Union will be given thirty (30) days notice and the opportunity to discuss the changes with the Company. A positive test for drugs (confirmed by GC/MS) or any violation of the Corporate Drug and Alcohol Policy shall be just cause for discharge. A positive test for alcohol shall have the consequences provided for in the Random Drug Selection Policy.

## ARTICLE 17
### Retention of Qualifications

**17.1 Retention of Qualifications.** Once an employee has qualified and has been certified on a job, the employee must remain certified on that job. Employees who fail to remain certified will be subject to disciplinary action up to and including discharge. The employee is expected to take advantage of overtime opportunities to stay familiar with the job. The Company will also provide refresher training.

## ARTICLE 18
### Maintenance Section

**18.1 Classifications.** Effective with the date of the signing of this contract, the Maintenance Section shall be composed of the following classifications:

A. Field Mechanic
B. Machinist
C. Analyzer Technician
D. Welder
E. Meter and Instrument Technician
F. Electrician
G. Refrigeration Technician
H. Transportation
I. Garage Mechanic
J. Valve Technician
K. Seal Technician

The Company shall not be required to have any minimum number of employees in any classification.

The Company recognizes that it is in the best interest of the Company, the Union and the employees to utilize employees to the fullest extent practical in their above listed classification.

However, it is understood by the parties that the above listed Maintenance Section classification employees will accept any work order pertaining to any type of work in the Maintenance Section and perform the work to the best of their ability.

**18.2 Shift Openings in Classifications.** In the event there is a shift opening in any classification (including day jobs for weekend coverage in the Maintenance Section) and no one bids the job, it is agreed that the 1-C employees in that classification will be asked for their preference by seniority. If no one agrees to accept the job, the junior section 1-C employee in the classification will be placed on the job until a qualified 1-C employee in the classification can be obtained.

**18.3 Work Assignments.** All non-maintenance personnel will perform simple mechanical work.

**18.4 Maintenance Staffing.** An employee who is hired or seeks transfer into the Maintenance Section must have completed trade school or equivalent training and have obtained a minimum of 3 years experience in the skills he is to perform in his classification. The progression system may be bypassed at management's discretion for candidates who are qualified and can pass the qualifying examination. Employees will advance to the top rate through training. The training will include 40 hours of schooling and on-the-job. The program will be administered as follows:

A.     Employees will enter the program at the 12-month progression rate

B.     After 12 months of employment, the employee will be administered a
       written test and a field test. The employee must score 80% on each test to

38

39

Case 3:03-cv-00585-JJB    Document 1    07/30/03    Page 30 of 64

move to the next higher rate in the progression. Should the employee fail to pass either test, the employee will remain in the 12-month progression rate for 6 months, at which time he will be allowed to retest. Should the employee fail the retest, the employee will remain another 6 months in the 12-month progression rate and retest again. If he fails this retest, he shall be subject to termination.

C.  No employee will be allowed to advance to a higher progression rate until the employee passes the written test and the field test.

D.  The above procedure will be followed at each level of the progression system until the employee reaches the top rate.

E.  Management reserves the right to accelerate the employee to top rate through the progression system.

F.  All testing for progression will be as determined by the Company.

**18.5 Transfer between Classifications within Section.**  The following shall apply when an employee in the Maintenance Section seeks to transfer to a vacancy in another classification in the Maintenance Section. A qualifying test will be given to all employees who bid for the vacancy. If more than one employee passes the qualifying test, the vacancy shall be awarded in accordance with Article 9 (dealing with seniority). If no bidding employee passes the qualifying test, the Company may elect to offer the bidding employees by seniority the opportunity to transfer to the vacancy, or may fill the vacancy from outside: provided, that the Company will not hire in to fill a vacancy at a lower progression than a bidding employee has passed. The employee selected will enter the classification at the 24-month progression rate. Employees will progress to the top rate in accordance with Article 18.

40

## ARTICLE 19
### Duration

**19.1  Duration.**  This agreement shall be effective from June 15, 2001 through June 14, 2004 and from year to year thereafter unless prior written notice of intent to modify, amend or terminate this Agreement is given by either party to the other not less than sixty (60) days before the end of any contract term.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be duly executed by their respective duly authorized representatives as of June 15, 2001.

FORMOSA PLASTICS CORP., LA
BATON ROUGE PLANT
BATON ROUGE, LOUISIANA

By _____
Kelly B. Serio, Vice President/General Manager

_____
John Jones, Director, Administration

_____
Tim LeBlanc, Human Resources Manager

TEAMSTERS LOCAL NO. 5
BATON ROUGE, LOUISIANA

By: _____
Keith Partin, Business Manager

_____
Reggie Ducote, Business Agent

COMMITTEE MEMBERS

_____
William Wilson

41

Case 3:03-cv-00585-JJB    Document 1    07/30/03    Page 31 of 64

## CHECK OFF AUTHORIZATION AND ASSIGNMENT

David Heuvel

Willard Clark

Brad St. Pierre

Martin Ware

Robert Corkern

Joel Randolph

Richard Hanson

**CHECKOFF AUTHORIZATION AND ASSIGNMENT**

I, _____ (Print Name) _____ hereby authorize my employer to deduct from my wages each and every month an amount equal to the monthly dues, initiation fees and uniform assessments of Local Union _____, and direct such amounts so deducted to be turned over each month to the Secretary Treasurer of such Local Union for and on my behalf.

This authorization is voluntary and is not conditioned on my present or future membership in the Union.

This authorization and assignment shall be irrevocable for the term of the applicable contract between the union and the employer or for one year (whichever is the lesser, and shall automatically renew itself for successive yearly or applicable contract periods thereafter, whichever is lesser, unless I give written notice to the company and the union at least sixty (60) days but not more than seventy five (75) days before any periodic renewal date of this authorization and assignment of my desire to revoke same.

Signature _____

Social Security Number _____    Date _____

Address _____

City _____    State _____    Zip Code _____

Employer _____
Original to Employee    L-3074-Printed in U.S.A    Copy to Local Union

Union dues are not deductible as charitable contributions for Federal Tax purposes

42

43

## BATON ROUGE PLANT
## HOURLY LABOR RATE SCHEDULE

**I. Operations**

| | 6-15-01 | 6-15-02 | 6-15-03 |
|---|---|---|---|
| Utility/Board Operator . | $22.28 | $22.95 | $23.64 |
| Operator 1C | $21.46 | $22.10 | $22.76 |
| Operator 2C | $20.67 | $21.29 | $21.93 |
| Operator 3C | $19.73 | $20.32 | $20.93 |
| Reserve Operator | $18.86 | $19.42 | $20.01 |

**II. Maintenance**

| | | | |
|---|---|---|---|
| Field Mechanic | $22.21 | $22.88 | $23.56 |
| Machinist | $22.21 | $22.88 | $23.56 |
| Analyzer Technician | $22.21 | $22.88 | $23.56 |
| Welder | $22.21 | $22.88 | $23.56 |
| M & I Technician | $22.21 | $22.88 | $23.56 |
| Electrician | $22.21 | $22.88 | $23.56 |
| Refrigeration Technician | $22.21 | $22.88 | $23.56 |
| Valve Technician | $22.21 | $22.88 | $23.56 |
| Seal Technician    . | $22.21 | $22.88 | $23.56 |

**III. Laboratory**

| | | | |
|---|---|---|---|
| Routine Chemist | $22.21 | $22.88 | $23.56 |

**IV. Operator/Laboratory/Maintenance Progression**

| | | | |
|---|---|---|---|
| Hire | $14.60 | $14.60 | $14.60 |
| 6 months | $16.74 | $17.24 | $17.76 |
| 12 months | $18.09 | $18.63 | $19.19 |
| 24 months | $19.44 | $20.02 | $20.62 |
| 36 months | $20.79 | $21.42 | $22.06 |
| 48 months | Top Rate | Top Rate | Top Rate |

NOTE: At management's discretion. operating. laboratory, and maintenance employees may be hired at a rate above the entry level based upon prior experience, education, training and certification.

**V. PVC Loader Progression**

| | 6-15-01 | 6-15-02 | 6-15-03 |
|---|---|---|---|
| Hire | $12.00 | $12.00 | $12.00 |
| 6 months | $13.72 | $14.14 | $14.56 |
| 12 months | $15.00 | $15.45 | $15.91 |
| 24 months | $16.03 | $16.51 | $17.01 |

---

## Memorandum of Understanding

After the ratification of the Contract, the Company and the Union will meet to negotiate a procedure to address 12-hour shift Maintenance language.

 

Tim LeBlanc          Date
FPC H/R Manager

Reggie Ducote          Date
Local No.5 Business Agent

Case 3:03-cv-00585-JJB   Document 1   07/30/03   Page 33 of 64

Upon the effective date of the contract agreement, the Company and the Union are in agreement to grandfather those incumbents currently holding the position of IC, Board, Utility, and Relief to bid on position of lower pay rate should the employee chose to do so.  All employees who bid up to the position as listed above, after the signing of the contract, will follow the language as specified in Article 9 7 . B

Tim LeBlanc          Date
FPC H/R Manager

Reggie Ducote          6-26 01
Reggie Ducote          Date
Local No.5 Business Agent

46

The Company and the Union are in agreement to meet and discuss the distribution of overtime in the Maintenance section which deals with the allocation of overtime between Formosa Plastics Corporation, Louisiana employees and contract employees.

Tim LeBlanc          6/26/01
Tim LeBlanc          Date
Human Resource Manager

Reggie Ducote          6-26-01
Reggie Ducote          Date
Local No. 5 Bussiness Agent

47

Case 3:03-cv-00585-JJB    Document 1    07/30/03    Page 34 of 64

## CONCORDANCE TABLE

The collective bargaining agreement was placed in a new format in the 2001 negotiations. Provisions were relocated to put related provisions together, and article and section titles were added. The parties did not intend to make substantive changes by this new format, but only to make the agreement easier to understand.

The following table shows where each section in the new format was located in the old format.

| NEW FORMAT | OLD FORMAT | NEW FORMAT | OLD FORMAT |
|---|---|---|---|
| 1.2 | Introductory Paragraph | 9.9 | 26 |
| 1.3 | 1A | 9.10 | 25 |
| 2.1 | 2 | 9.11 | 27 |
| 2.2 | 1B | 9.12 | 28 |
| 2.3 | 1C | 9.13 | 29 |
| 2.4 | 1D | 9.14 | 30A |
| 3.1 | 1G and 1H | 9.15 | 31 |
| 3.2 | 1F | 9.16 | 30B |
| 3.3 | 1A-D | 10.1 | 14 |
| 3.4 | 1E | 10.2 | 14 |
| 3.5 | 19 | 10.3 | 14 |
| 3.6 | 4 | 11.1 | 33 |
| 3.7 | 44 | 11.2 | 33 |
| 3.8 | 17 | 11.3 | 33 |
| 4.1 | 1.E | 11.4 | 33 |
| 5.1 | 42 | 11.5 | 33 |
| 6.2 | 40 | 11.6 | 33; |
| 6.1 | 41 | 12.1 | 45A |
| 6.2 | 5 | 12.2 | 45B |
| 6.3 | 3 | 12.3 | 45C |
| 6.4 | 6 | 12.4 | 45D |
| 6.5 | 7 | 12.5 | 45E |
| 6.6 | 8 | 12.6 | 45F |
| 6.7 | 9 | 12.7 | 45G |
| 6.8 | 10 | 12.8 | 45H |
| 6.9 | 11 | 13.1 | 48D |
| 6.10 | 12 and 13 | 13.2 | 48F |
| 7.1 | 36 | 14.1 | 34 |
| 7.2 | 30E | 14.2 | 35 |
|  | 30C and D | 14.3 | 41 |

| NEW FORMAT | OLD FORMAT | NEW FORMAT | OLD FORMAT |
|---|---|---|---|
| 8.1 | 15A | 14.4 | 48J |
| 8.2 | 15B | 14.5 | 48H |
| 8.3 | 15C | 14.6 | 48K |
| 8.4 | 16 | 15.1 | 46 |
| 8.5 | 17 | 16.1 | 48G |
| 9.1 | 20 | 17.1 | 38 |
| 9.2 | 19 | 18.1 | 47 |
| 9.3 | 21 and 48B | 18.2 | 48A |
| 9.4 | 18 | 18.3 | 48E |
| 9.5 | 24A | 18.4 | 48I |
| 9.6 | 24B, 23, 32 | 19.1 | 1 |
| 9.7 | 24B, 48K |  |  |
| 9.8 | 24C |  |  |

**FORMOSA PLASTICS CORPORATION, LOUISIANA**   TLX: ITT 475-4065 FPC USA
P.O. BOX 271 ● BATON ROUGE. LOUISIANA 70821-0271 ● TEL: (504) 356-3341 ●   FAX: (504) 356-8611

December 12, 2002

Mr. Richard T. Hanson
18361 Lake Indigo Dr.
Baton Rouge, La  70817

Dear Mr. Hanson:

On December 11, 2002 an investigatory meeting was held to discuss an incident in which you were observed sleeping during working hours in an isolated corner of the Lab storage area on the morning of Sunday, December 8th. Present in the meeting were you, Teamsters Representative Reggie Ducote, Union Steward Marty Ware, Human Resource Manager Tim LeBlanc, and I.

In this meeting you stated that at approximately 8:00 to 8:15 a.m., you went to take a break in the lunchroom. You said that due to the distractions (noise) of the PVC Loaders and technicians in the lunchroom, you wanted to get away and read the sports section of the newspaper in a quiet area. You voiced your displeasure of the PVC Loaders using the Lab lunchroom as a break area. You stated that you took the sports section and went to the corner of the storage area to read it. You said that at some point in reading the paper, you fell asleep. You further stated that you were sound asleep and would have slept the entire day had you not have been awoken. You denied that you intentionally went to the storage area to sleep. You said that you had had a tough night at home. Your shift began at 6:00 a.m.

The investigation has been concluded and the facts dispute many statements in your testimony. Testimony from the Lab technicians indicated that it was a quiet Sunday morning. They stated that there were no additional personnel in the Lab that morning and the lunchroom was empty. This disproves your stated reason for being in the storage area.

At approximately 7:30 a.m., Quality Engineer Brandon Melancon attempted to contact you via telephone to obtain results of the VCM railcar analysis for shipment. A Lab Technician received the phone call but was unsuccessful at locating you in the Lab. Based on this information, it can be concluded that this incident actually started at or prior to 7:30 a.m. and not between 8:00 and 8:15 a.m. as you testified.

At approximately 8:00 a.m., I arrived in the Lab to catch up on needed paperwork. You received a second phone call in which a second Lab Technician was unsuccessful at locating you. Upon entering the training area, I noticed PVC powder on the floor of the storage area and proceeded to clean it up. This is when I observed you sleeping in the corner of the storage area. I obtained a witness, PVC Supervisor Doc Callegan, and we entered the Lab at approximately 8:30 a.m. At

685311_:



EXHIBIT
2

this time, you received a third phone call and were paged loudly by a third technician, to which you still did not awake. Doc and I then awoke you.

During the time you were sleeping, you neglected your job duties. Two "red tagged" samples were logged in for analysis in your designated area at 8:10 a.m. Due to your absence and the nature of the emergency sample, one sample was completed by one of your co-workers. The other sample was not started until 8:50 a.m., after you were awakened. As you are aware, red tagged samples take priority over all samples and are considered high importance.

The above facts establish that you positioned yourself in a place and manner where you could not be seen by your co-workers and went to sleep for an extended period of time. The facts indicate that you intended to sleep, or at least put yourself in a position in which falling asleep was to be expected.

For the reasons stated above, your employment with Formosa Plastics is terminated effective December 12, 2002.

Sincerely,

Fred Swavely
QA/QC Manager

688211_1

Case 3:03-cv-00585-JJB   Document 1   07/30/03   Page 39 of 64

@02

PLANT EMPLOYEES
MECHANICAL EMPLOYEES
MATERIALS SUPPLY EMPLOYEES, ETC.

FREIGHT EMPLOYEES
OFFICE EMPLOYEES
PUBLIC EMPLOYEES

CONSTRUCTION EMPLOYEES
SALESMEN
PROFESSIONAL EMPLOYEES

# TEAMSTERS  LOCAL No. 5

General Membership Meets 4th Monday Every Month

"United To Protect — Not Combined To Injure"

Office (225) 924-3886 • Fax (225) 924-1757 • Toll Free 1-800-738-3483 • 1772 Dallas Drive • Baton Rouge, Louisiana 70806

# GRIEVANCE FORM

**COMPANY** – *Formosa Plastics, Inc.*

**GRIEVANT** – *Todd Hanson*

**DATE OF INCIDENT** – *December 12, 2002*

**Business Manager** – *Keith Partin*

**COMPLAINT** – *The Union is protesting the termination of Todd Hanson by Formosa. Since this is a termination, the Union request that the grievance be moved to the third (3rd) step of the grievance procedure as soon as possible.*

Date Filed – 12/13/02                    Date sent to Company  12/13/02

Disposition _____

**EXHIBIT**

**3**

 SAFETY FIRST. UNION DRIVERS ARE EXPERIENCED DRIVERS WHO RESPECT SAFETY REGULATIONS

ARBITRATOR'S DECISION AND AWARD

| | |
|---|---|
| IN THE MATTER OF ARBITRATION<br>BETWEEN: | ) |
| | ) |
| | ) |
| | ) |
| TEAMSTERS LOCAL NO. 5 AND RICHARD<br>TODD HANSON, GRIEVANTS | ) No. 03-04568-3 |
| | ) |
| and | ) ISSUES: DISCHARGE, |
| | ) JUST CAUSE, |
| FORMOSA PLASTICS CORPORATION | ) EXCESSIVE PUNISH- |
| | ) MENT |
| | ) |

Date of Demand for Arbitration:    December 19, 2002

Dates of Hearing    April 11 & 28, 2003

Date of Closing of the Record    June 30, 2003

Date of Decision    July 5, 2003

Appearances:

    Grievants:    Randall G. Wells

    Respondent:    Gregg R. Kronenberger

    Arbitrator:    Michael S. Hill

**EXHIBIT**

4

## I. BACKGROUND

Formosa Plastics Corporation operates a plant in Baton Rouge, Louisiana which produces a number of products including ethylene dichloride and vinyl chloride monomer.

Richard Todd Hanson, known as Todd Hanson, the Grievant, was employed by the firm as a laboratory tech analyst/chemist under a collective bargaining agreement between Formosa Plastics Corporation and Teamsters Local No. 5. Todd Hanson was terminated on December 12, 2002.

A grievance was filed on 12-13-02, went to step 3 on 12-18-02, and arbitration was subsequently requested. A hearing was held on 4-11-02 and 4-28-02 at the Radisson Hotel in Baton Rouge. The parties were represented by counsel as indicated on the cover sheet. They presented their arguments, introduced documentary evidence, examined and cross-examined witnesses, and presented their cases in full.

## II. ISSUES

The issues presented to the Arbitrator are whether the employer discharged the Grievant, Todd Hanson, with or without just cause, and if with just cause, was the penalty excessive?

## III. RELEVANT DOCUMENTS

Documents entered as Exhibits include the collective bargaining agreement, the grievance, letter of termination, a letter pertaining to possible medical impairment, a map of the plant layout, sample log in forms, pictures of the training room, memos, witness reports, production records,

2

disciplinary rules, investigation notes, meeting notes, records of other disciplinary actions, a medical prescription, and time records.

### IV. SUMMARY POSITIONS OF THE PARTIES

#### A. RESPONDENT

The Respondent's position is that misconduct of the Grievant resulted in his termination. The Grievant was found sleeping in a lab storage area in a partially concealed area. Grievant could not be found between 7:30 a.m. and 8:00 a.m. and did not handle two red tag samples which were received in the plant at 8:10 a.m. Grievant was asleep for an extended period of time. He intended to sleep or placed himself in a position in which falling asleep was to be expected. Grievant was terminated with just cause according to company rules.

#### B. GRIEVANTS

The Union and the Grievant dispute the firm's position that the Grievant intended to hide and intended to sleep. They contend that Grievant went to the storage area because it was a quiet place and to read the Sunday newspaper, that he went to sleep because he had a sleep disorder for which he was taking medication. Grievants also stated that Todd Hanson was the first person terminated for a first infraction of the rules against sleeping. Other persons found sleeping on the job who were terminated had other rules violations. Other persons received lesser discipline.

### V. SUMMARY OF THE EVIDENCE

3

A letter from Fred Swavely, QA/QC Manager, dated 12-12-02, to Todd Hanson, Grievant, stated that he was terminated for sleeping while on duty, that he was found asleep in an isolated corner of the Lab storage area, and that he had neglected his duty of handling two red tag samples that were received in the plant at 8:10 a.m. The letter stated that he was asleep for an extended period of time. He concluded that Todd had intended to sleep or had placed himself in a position in which falling asleep was to be expected.

Pictures presented in the hearing indicated that the corner of the storage room where Grievant was found sleeping was not visible from the entrance to the room.

A memo, dated 12-8-02, from Fred Swavely to Donald Augustine, indicated that he found Todd Hanson asleep in the back of the training room at 0800 Hours, that he waited about 30 minutes, then asked Carl Callaghan, PVC Supervisor, to confirm his observations. They found him still asleep at 8:30 and woke him up. Todd was sent back to work.

Mr. Callaghan provided a witness report of finding Todd asleep. Investigation notes indicated that Brandon Melancon had called for Todd about 7:30 and no one could find Todd. Brandon provided his cell phone record to the company which indicates that the time of his call was 7:38 a.m.. The record was dated in January, 2003, so was not available at the time of the termination decision.

Company records indicate that Travis Collier was

4

terminated for sleeping on the job in a dark room behind a locked door. He was lying on a prepared bed. He had prior discipline for tardiness, absenteeism, failure to follow instructions, and other infractions.

Don Eliot and Feltus Davis were both terminated for the same incident as that of Travis Collier. Eliot had one prior incident of sleeping on the job which resulted in a final warning. Davis had prior discipline for attendance, procedure violations, and insubordination.

William Whitley received a final written warning for sleeping in a work area. He had prior discipline for other infractions.

Wilbert Lewis received a 3 day suspension for sleeping in his truck. He also did not find a gas leak. He had no prior discipline.

Randy Jordan was found sleeping in the maintenance office with the door closed. He received an oral warning and had no prior discipline.

Thomas Johnson was issued an oral warning for sleeping in the break room. He had no prior discipline.

M. Askins was asleep on top of evaporators. He apparently received an oral warning. Greg Travis was asleep in the control room, had no prior discipline, received an oral warning.

Tim Lindsly was not disciplined due to lack of evidence found in the investigation.

A GCl Report indicated that a sample 4 was initiated by

5

Todd Hanson at 7:40 a.m. on 12-8-03.

Frederick Swavely, QA/QC Manager, testified that Todd Hanson was a relief technician and therefore, was qualified to perform all the tests in the Lab. He was the only technician qualified to perform all tests.

Mr. Swavely stated that he came in to work on Sunday, December 8, 2002. He did not work on Saturday and usually only worked Monday through Friday. He came in on 12-8-02 to get a head start on what he thought would be a busy week. He said that he arrived at the Lab at about 7:55 a.m. He saw four technicians when he first came in, but did not see Todd Hanson. He went straight to his office. After starting the computer and getting a cup of coffee in the lunch room, he went to the training room storage area to check on some spilled PVC that he thought was unsightly. At that time he found Todd Hanson asleep in the storage area in the corner of the room. Todd was in an area partially enclosed by boxes. Todd was sitting in a chair that was placed in the corner because it was broken and the firm did not want anyone using it. Todd was slightly reclined with his feet up on two other chairs. His eyes were closed and he was breathing deeply. Mr. Swavely said that he had never seen anyone but Todd sitting in that chair. He said that he had frequently seen Todd sitting at a table in the training room that was visible from the hall and entrance to the training room.

Mr. Swavely said that he did not wake up Todd, that he

6

went back to his office to do some paperwork. He thought about the situation of Todd, decided that it was a disciplinary situation, and so he called for a witness, Doc Callaghan. He stated that he and Mr. Callaghan found Todd Hanson asleep and at that time woke him up.

Mr. Swavely said that he met with Don Augustine, QA/QC Supervisor, and later Tim LeBlanc, Human Resources Manager, on 12-9-02, Monday morning. An incident report was prepared on 12-9-02. A meeting was held with Todd Hanson with Don Augustine also present to give Todd an opportunity to explain. He said that he had a rough night the night before.

Mr. Swavely stated that he reviewed log sheets for the 8th, had pictures made of the training room, and jointly worked on a termination letter. A meeting with Todd was again held on 12-11-02. In the meeting Todd stated that he might have been sleeping all day if he had not been awakened. Interviews were subsequently conducted with employees who worked on 12-8-02. The persons interviewed were Mike McIntyre, Gary Davis, Audlandra Aaron, and Terry Burhoe. From the records he examined and the interviews he conducted, Mr. Swavely concluded that Todd Hanson was not available for work on 12-8-02 from 7:30 a,n, to 8:30 a.m. At that point, he drafted a letter of termination. A warn-ing discipline notice was also prepared.

After the termination on 12-12-02, a third step grievance meeting was held on 12-18-02 with several persons

present.  Mr. Partin asked him why he did not wake up Todd immediately.  He replied that he did not begrudge a person taking a break and he did not know at that time how long Todd had been asleep.  He also stated in the meeting that he considered the room where Todd was found to be a storage area, not a work area.  The training area of the room is used for training and for breaks.  Mr. Swavely stated that if Todd had awakened immediately upon discovery, things would have been different.  He would have been working on the duties required of him.  In the meeting, Mr. Swavely indicated that he first learned of Todd having some kind of a sleeping disorder.

Mr. Swavely stated that Todd Hanson was trusted as a good analyst, and he had no prior work infractions.  Mr. Swavely also stated that he had seen Todd many times taking a break at the training table, reading a newspaper or doing paperwork.

Mr. Swavely stated that analysts occasionaly obtained information from a Rolodex file in the area where Todd was found.  He also stated that Todd did have a newspaper over his legs when he was found.

Mr. Swavely estimated that he discovered Todd at 8:05 or 8:10 a.m.  He further stated that he knew a telephone call came in about 7:30 a.m. and he heard a bell ring at about 8:10 a.m.

Mr. Swavely stated that red tag samples should be run as soon as possible.  He further stated that it was not

unheard of for a red tag to take an hour and a half to run. One red tag took seven hours.

Mr. Swavely stated that he observed Todd with his head down on his arms, possibly asleep, on about three occasions, but he did not know Todd had any kind of sleep problem. He also said that Don Augustine stated he had no knowledge of Todd having any problem.

Gary Davis, analyst, testified that he saw Todd Hanson in the chair in the storage area, appearing to be asleep at a time after Mike McIntyre was looking for him. He said it was some time between 7:30 a.m. and 8:00 a.m. Gary Davis said that he ran a red tag sample that came in at 8:10 a.m. according to the log. He stated that he saw Todd in the chair in the storage area the day before.

Mr. Davis also stated that he was aware of Mike McIntyre taking a telephone call between 7:30 and 8:00 on 12-8-02. After Mike looked for Todd, he told Mike that the call was his responsibility and he would handle it.

Carl "Doc" Callegan, vacation relief supervisor, stated that he received a telephone call from Fred Swavely on 12-8-02 at about 8:30 a.m. He wanted him to be a witness. Mr. Callegan went with Mr. Swavely to the storage area where he observed Todd Hanson sleeping in a chair with a newspaper open in his lap.

Mike McIntyre, lab technician, stated that he received a telephone call from Brandon Melancon, a supervisor, on 12-8-02. He looked for Todd to handle the call. He could

9

not find Todd, but he did see Gary Davis who provided the information to answer the call. He stated the call came in about 7:45, or between 7:30 and 8:00.

Brandon Melancon stated that he called the plant at about 7:30 a.m. on 12-8-02 and talked with Mike McIntyre who attempted to find Todd Hanson. Unable to find Todd, Mike put Gary Davis on the call. The time of the call was 7:38 according to Mr. Melancon's telephone bill which was dated 1-4-03 and which was not obtained until a week before the hearing.

Don Augustine, quality control/quality assurance lab supervisor, stated that his first involvement with the situation of Todd was on 12-9-02. He was in a meeting with Todd and Fred Swavely. He was asked to provide GC-1 and GC-10 sample reports to Tim LeBlanc, Human Resources Director. He stated that according to the GC-1 reports for 12-8-02, the last time that Todd was at the machine pushing a button to run a test was 7:26 a.m. because at the time it took 30 minutes of thermostat time prior to the time recorded for the test.

Mr. Augustine stated that he was at the third step grievance meeting. When asked when a red tag sample should be tested, he said, "Immediately." He also stated in the meeting that he had no prior knowledge of Todd Hanson having a sleeping disorder. He also stated that there was no need for lab analysts to use the Rolodex in the storage area because he had more up to date information in his computer.

10

Mr. Augustine stated that he took the pictures of the storage room areas. He corrected his earlier statement referring to a thermostat time of 30 minutes. He agreed that the thermostat time for the test in question was 15 minutes. That meant that the last test run by Todd before he went to sleep in the storage area was begun at about 7:40 or 7:41 a.m.

Mr. Augustine said that he might have said that he would not have fired Todd Hanson, but he also stated that he was not asked for his opinion. He also stated that he would not have awakened Todd when he was first discovered in answer to a hypothetical question.

Tim LeBlanc, Human Resources Manager, stated that he had personally conducted a class on company policies including the rules of discipline. Todd Hanson had signed as attending the class. Tim LeBlanc indicated that there were two rules pertaining to sleeping. C11 is sleeping during working hours in the employee's immediate work area. C12 is sleeping in another work area with the perceived intent of sleeping. He further explained the C11 calls for progressive discipline. C12 is considered to be a termination offense.

Mr. LeBlanc stated that he first heard of the incident with Todd on Monday morning. He instructed Fred Swavely to take pictures of the storage area and to meet with Todd to ask him if he had anything to say about what happened. A meeting was held with Todd on 12-11-02. In the meeting,

11

Todd admitted he was sleeping, stated if he had not been awakened, he might have been asleep all day. Todd stated that he wanted a quiet place to get away and read the paper.

Mr. LeBlanc stated that Todd indicated that he took a break between 8:00 and 8:15. He said that he checked on the condition of the chair that Todd was asleep in and concluded that by propping up one side of the chair on boxes, that the chair was comfortable. He conducted several interviews with employees. He concluded that the plant was quiet on that Sunday and that there was no reason for Todd to be in the storage area. He also concluded that the times for which Todd was accountable were in question.

He prepared the letter of termination of 12-12-02. After the grievance was filed by the union, a third step grievance was held on 12-18-02. Mr. LeBlanc stated that he prepared notes of the meeting.

He stated that during the meeting, Todd indicated that he had a sleeping disorder. Todd indicated that he had been asleep in that same location five or six other times. The company viewed his statement to indicate that he intended to go to sleep in the storage area.

In the meeting, Todd provided a prescription for a medication that he was taking at the time. Due to the late notice to the company of the sleeping disorder, Todd was not asked to provide any medical records. According to company policy, employees taking medication that may impair their ability to perform their job should notify their supervisor

12

or manager. He indicated that Todd was believed to be in violation of the policy.

Mr. LeBlanc stated that Todd Hanson was aware of the disciplinary guidelines because he was in a class on the subject.

Mr. LeBlanc stated that he and Todd Hanson had some controversy over a planned layoff of employees. In a meeting, Todd called him a liar because he thought he had made conflicting statements to him about the size of the layoff. He stated that the layoff incident had nothing to do with the decision to terminate Todd.

Mr. LeBlanc stated that he provided the union with copies of prior discipline for sleeping, dated back to June of 1998. He said that Donny Elliot was terminated due to being on a final warning for sleeping, Feltus Davis had prior discipline for insubordination and any further rules infraction would lead to termination which did result from his sleeping incident. Travis Collier was terminated for nesting. He stated that grievances were filed in all three cases, but none went to arbitration.

In the case of William Whitley, it was determined that he fell asleep at his computer terminal with no intent to sleep which resulted in a written warning. Wilbert Lewis received a three day suspension for sleeping in his truck and failing to find a VOC leak in the same day. He was in a high traffic area, not a place of concealment. Randy Jordan was asleep in the maintenance office, not

13

in a concealed area.  He received an oral warning.  Thomas Johnson was asleep in the break room after being exposed to paint fumes in the rest room.  No intent was found in his case.  He received an oral warning.  Maurice Askins was given a written warning for sleeping on an evaporator which was in his work area.

Tim Lindsly was not found to be sleeping and no discipline was imposed.  Brent Travis was asleep in a high traffic area, no intent was involved, an oral warning was given.  Brad Verbois was found sleeping three times in one shift.  The last time was in a concealed area.  He was under investigation pending termination and resigned prior to a decision being rendered.

Mr. LeBlanc stated that in the case of Todd Hanson, there was ample evidence that he intended to go into the storage area for sleeping.  Also, during the time he was sleeping, he neglected his job duties of two red tag samples.  He was sleeping in an isolated, concealed area. He was not considered to be in his work area.

Mr. LeBlanc completed his testimony in saying that from 6:35 a.m. until 8:10 a.m., the company did not know what Todd was doing.  He stated that he received his information from Don Augustine.

Todd Hanson, Grievant, stated that he was terminated with no prior discipline for rules infractions.  He stated that he had a disagreement with Don Augustine and Fred Swavely about one week before he was terminated.  They told

him he would have to change the vacation week he had selected because a more senior employee had later selected that same week. Todd stated that he stated his objections to changing his vacaton week with Fred Swavely and indicated that he wanted to go to the next level of management, Kelly Serio. Fred told him not to do so and later in the day told him that he could have his vacation week that he had selected.

Todd stated that he had many disagreements with Tim LeBlanc pertaining to union-management matters, but they usually were able to work out their differences. In regard to the proposed layoff, he was originally told by Tim LeBlanc that 14 people would be laid off, then in the meeting that followed with some plant employees, Tim said he was uncertain how many would be laid off. When a proposed Memorandum of Understanding was drafted by the company, it included permanent transfers of junior senior- ity employees to more desirable positions in the plant which would have been objectionable to senior employees. The union was only in agreement with temporary transfers to reduce overtime worked by employees in other departments. The disagreement was not resolved with the company at the time of his termination. The MOU was withdrawn by the company.

Todd stated that he considered the storage area as his area of work. He stated that if not every day, at least once a week, he has something to do back there.

15

Todd Hanson stated that he reports to work each day between 5:30 and 6:00 a.m. and starts his day by performing the standardizing of the machines. Then he picked up log-in sheets and log forms to start running samples. He ran his first three samples by pressing the start button at 6:17 a.m. He had to press the button on the machine at about 7:40 a.m. This was indicated by 15 minutes bake time prior to the 7:56 time listed on the log sheet. After pressing the button on the machine at about 7:40 a.m. he stated that he had cleanup and record keeping work that took another 5 to 10 minutes. He stated that he then took his break. The GC10 reports show that he started samples at 6:35 a.m and he called in results at 7:15 a.m. He also put in samples at 7:20 a.m.

Todd Hanson stated that he began seeing a Dr. Todd in September, 2002 because he was going to sleep while at work. His doctor ran a series of tests and prescribed a medication called Adderall which did help with his problem. He said that he did inform his supervisor, Don Augustine. He said that Dessa Borders, a good friend and co-worker was present when he told Don Augustine of his problems. He further stated that he was not in violation of the policy on taking medication because the medication helped him rather than having impaired him while at work. However, he did inform Don Augustine that he was taking the medication.

After he was awakened on 12-8-02, Todd said that after going to Fred Swavely's office, he went back to work, worked

16

the rest of the day on the 8th, was off on the 9th, worked all day on the 10th and was told that there would be a meeting on the morning of 12-11-02, that he could bring a union representative to the meeting. After the meeting, he went back to work and finished the day. On the next day, 12-12-02, he was called and informed that he was terminated. He subsequently received the termination letter dated 12-12-02. He disagrees with some of the contents of the termination letter. He did state that he was having some tough nights and days because he was going through a divorce.

Todd Hanson said that it was common for all 17 lab employees to cover for each other in running samples. He indicated that he was initially trained by Gary Davis on all the jobs in the lab, and after the first year, they did not get along very well.

Mr. Hanson said that red tag samples were often not properly marked, that some were handled an hour and a half after receipt, and many were handled by someone covering for the person primarily responsible.

Todd Hanson stated that he thought he was treated in a different manner from other employees who were sleeping because he was the most vocal of the union representatives and he had disagreements with two of the three persons on the committee that decided on his termination.

Todd Hanson completed his testimony in saying he was not given the opportunity to review the times for which the

17

company was holding him responsible, nor was he asked any questions about the times.

Dessa Borders, lab technician, stated that she knew of no one who had been disciplined because of their red tag sample processing. She said that red tags should be processed as soon as possible, but it was not unusual for red tags to take several hours.

Dessa Borders stated that she heard Todd Hanson tell Don Augustine that he was getting medicine for his sleep problem and it would no longer be a problem. This occurred in Don's office which is small.

Dessa Borders stated that it was common practice for lab analysts to cover for each other on red tag samples.

Reggie Ducote, business agent for Teamsters Local 5, stated that he thought the discipline for Todd Hanson was excessive in light of discipline for others. He said that others terminated had bad employment records, with prior rules infractions, some serious such as insubordination. Todd had no prior discipline. He thought that Todd's sleeping was accidental while reading a newspaper and should have been considered a number 11 infraction with only an oral warning assessed.

## VI. DISCUSSION AND DECISION

The evidence presented in the hearing is that Todd Hanson, Grievant, was discovered asleep while at work on 12-8-02 by his Manager, Fred Swavely, at 8:00 a.m. This was reflected in documents and in testimony of Fred Swavely.

18

Mr. Swavely obtained a witness who verified that Mr. Hanson was still asleep a 8:30 a.m.

Although the Grievant states that he fell asleep by accident while reading a newspaper and that he had a sleep disorder that may have contributed to his being asleep, the Arbitrator does find that the company was not in error in its decision that Mr. Hanson had violated C12 of the rules of discipline.

C11 pertains to sleeping during working hours in the immediate work area, with or without the perceived intent of sleeping. C12 pertains to sleeping during working hours in another area with the perceived intent of sleeping. This excludes the break or lunch area.

The storage area of the training room was partially concealed and isolated according to evidence presented. The company did have perceived intent of sleeping in that the Grievant provided the appearance of wrongdoing in his decision to use a nonbreak, nonwork area to read a newspaper and go to sleep. His own statement that he had previously been asleep in that same area was also evidence of perceived intent. If he had made the choice of using the training area table to read the newspaper and had been asleep in that location, there would have been no perception of intent.

It is also concluded that Grievant did not provide any medical records to the company prior or subsequent to the decision to terminate his employment. Therefore, the company was under no obligation to alter its course of

19

action.   The Arbitrator could not ascertain from the hearing the nature of the Grievant's condition, whether his condition is permanent or temporary in nature, and certainly no request for any accommodation was made by the Grievant.

The letter of termination and testimony in the hearing indicate that the management believed that the Grievant was asleep and/or not performing work beween 7:30 a.m. and 8:30 a.m. He was also held responsible for not handling one of two red tag samples that were received at the plant at 8:10 a.m.   Two telephone calls not answered by the Grievant were the basis for the firm's belief.

The company's facts were not substantiated in the hear-ing.  Grievant was able to establish in the hearing that he pushed a start button on a machine at 7:40 a.m. and that he had to perform cleanup and paper work until 7:50 a.m.

In addition, it is the opinion of the Arbitrator that the Grievant is not responsible for the time between 8:05 a.m. and 8:30 a.m.

The Manager, Fred Swavely, violated two principles in not waking up the Grievant when he discovered him asleep at 8:00 a.m.   It would have been permissible for him to obtain a witness which would have meant that the Grievant would have been awakened at 8:05 a.m.

The Manager failed to mitigate the situation, which means that he allowed the situation to go from bad to worse. If a Grievant has a duty to diminish liability, the same principle should apply to Management.

20

A second principle is derived from the Fair Labor Standards Act. In this case, the Manager suffered or permitted the Grievant to sleep. This makes such period of time his responsibility.

In light of the Manager's actions, the Grievant cannot be held responsible for the red tag sample handled by another employee at 8:10 a.m. because presumably if the Grievant had been awakened at 8:05 a.m., he would have been able to run the red tag sample.

The time of 15 minutes that is unaccountable for the Grievant, part of which the evidence is clear that he was asleep, is just cause for discipline, in the opinion of the Arbitrator.

The documents and testimony do not lead the Arbitrator to a definite conclusion on the issue of disparate treatment. While it is clear that the Grievant had no prior discipline, the fact that others had prior discipline is not a deciding factor. It is also true that employees who had discipline of less than termination may have had less in evidence or questions dealing with their work area or the site of the infraction.

The fact that the Grievant had no prior infractions in his record and that he had been willing to assume added responsibilities both in his position of lab analyst and as Steward and Chief Steward with the union are points in his favor.

21

It is not clear as to when the Grievant could be considered to be on break.  Since an analyst could be called to duty at any time during his shift, the firm could expect that exployees should be awake even during break times.

VII. AWARD

Based upon the above, an award is made commensurate with the evidence provided in comparison to the charges made against the Grievant in the termination letter.  The termination of the Grievant is reduced to a suspension of one month for the period of December 12, 2002 to January 11, 2003.  The Grievant is to be reinstated to his position within 15 days of the receipt of the Award and compensated with back wages for the period of January 12, 2003 to the date of reinstatement, less any interim earnings from employment.  The payment of back wages should be effected within 15 days of receipt of documentation of any interim earnings.